608 A.2d 280

WEICHERT CO. REALTORS, PLAINTIFF-RESPONDENT,
v. THOMAS W. RYAN AND JAY SAUNDERS,
DEFENDANTS-APPELLANTS.

Argued February 19, 1992—Decided July 2, 1992.

*H. John Schank, II,* argued the cause for appellants (*Crummy, Del Deo, Dolan, Griffinger & Vecchione,* attorneys; *Mr. Schank* and *Robert W. Delventhal,* on the brief).

*Martin Newmark* argued the cause for respondent (*Broderick, Newmark & Grather,* attorneys).

The opinion of the Court was delivered by

STEIN, J.

Plaintiff, Weichert Co. Realtors (Weichert), sought damages from defendants, Thomas Ryan and Jay Saunders, based on defendants' failure to pay Weichert for brokerage services rendered by William Tackaberry, a Weichert employee. Weichert based its claim on defendants' alleged breach of contract, or, in the alternative, on a theory of *quantum meruit.* The Appellate Division upheld the trial court's determination that Weichert was entitled to recover damages for breach of contract. We granted defendants' petition for certification, 127 *N.J.* 546, 606 *A.*2d 360 (1991), and now modify the judgment of the Appellate Division, remanding for a new trial limited to the issue of damages.

I

In late March 1987, Socrates Kyritsis, a property owner, met with Robert Olpp, the manager of Weichert's Chatham office, and Tackaberry, a real estate agent in that office, and told them he wished to sell the "William Pitt property" for $3,000,-000, with the sales commission to be paid by the buyer. Shortly after that meeting, Tackaberry telephoned Ryan, a local developer, and informed him that he knew of a property that Ryan and Saunders, his partner, might be interested in purchasing. Tackaberry also stated that the purchaser would have to pay

Weichert a ten percent commission. Ryan indicated that he was interested in knowing more about the property, and Tackaberry disclosed the property's identity and the seller's proposed price. Ryan ended the conversation by agreeing to meet with Tackaberry to obtain more information.

As a result of his telephone conversation with Ryan, Tackaberry met with Kyritsis to acquire information concerning the property's current leases, income, expenses, and concerning plans for its eventual development. Tackaberry also collected tax and zoning documents relevant to the property. In a face-to-face meeting held on April 4th, Tackaberry gave Ryan the data and information he had procured. Tackaberry began that meeting by presenting Ryan with a letter dated April 3, 1987, that stated in part, "As compensation for this information * * * there will be a ten percent finders fee to be paid by your group upon successfully completing and closing of title." Ryan testified that he had refused Tackaberry's request that he sign the letter, and had explained to Tackaberry that he needed more information about the property before he could commit to the broker's fee, and therefore they would discuss that fee later. Tackaberry, however, testified that he had not asked Ryan to sign the letter, although on cross-examination he admitted that he had been intent on memorializing the agreement in writing. According to Tackaberry, after Ryan had read the letter, he had indicated only that he was concerned about the method and timing of the commission payment. Tackaberry did not pursue that point, apparently assuming that the parties would resolve that issue at a later date. Ryan ended the meeting by instructing Tackaberry to arrange a meeting between Ryan and Kyritsis. Ryan took the letter and the information with him, and later used the information to evaluate the project.

On April 7th, Ryan and his attorney met with Kyritsis to discuss the sale of the property. Although Ryan initially refused to allow Tackaberry to attend that meeting, he relented when Tackaberry insisted. Before the meeting began, Tackaberry offered unsolicited advice concerning how to negotiate

effectively with Kyritsis. The meeting was successful, and afterwards Ryan instructed his attorney to prepare a draft contract for the purchase of the William Pitt property for $3,000,000. At that time Ryan informed Tackaberry that he had discussed the commission issue with Saunders, and they both agreed that ten percent was too much to pay for Tackaberry's services. Tackaberry insisted that Ryan had already agreed to pay ten percent. After some discussion the two parted without resolving the issue.

At trial, the parties did not dispute that from the April 7th meeting until the closing, Ryan consistently had told Tackaberry that he would not agree to pay a ten percent commission. Ryan testified:

> We had several discussions about the amount of the fee, the method of payment of the fee, but we were not able to be in agreement as to the amount of the fee. Mr. Tackaberry was insistent on the $300,000 amount. I indicated to him on several occasions, verbally that I would not sign his $300,000 letter, * * * the April 3rd letter, [ ] and that it was just too much money[. T]o pay out as the property was developed was discussed and was, I felt, agreeable to Mr. Tackaberry. But we were not and have not been able to agree on the amount of a finder's fee.

Tackaberry's subsequent involvement in the transaction was unsolicited by Ryan and Saunders. At trial he acknowledged that "there were no phone calls coming in my direction." Nevertheless, he continued to participate in the sale by carrying draft contracts back and forth between the parties, and offering negotiating advice. When Kyritsis eventually decided to raise the price of the property by $250,000, he informed Tackaberry, who broke the news to Ryan and Saunders. After Kyritsis signed the final contract, Tackaberry delivered it to Ryan and Saunders for their signature. The final contract, signed by Ryan and Sauders on April 27th, stated:

> Both parties represent to each other that they have not dealt with any broker or other person entitled to a commission in connection with this transaction except Weichert Realtors ("Weichert"). Buyer agrees to pay any broker's commission due Weichert as per separate agreement between Buyer and Weichert. Buyer agrees and covenants to protect and indemnify Sellers against and/or with regard to such commissions.

On May 4th, Tackaberry wrote to Ryan and Saunders, bringing to their attention some errors in the contract. He again requested that they sign his April 3rd letter indicating that they would pay a ten percent broker's fee, and informed them that the fee would be due and payable by certified or attorney's check at the closing. The letter had two spaces for Ryan's and Saunders' signatures underneath the caption "Acknowledgement of Commission Agreement." Tackaberry personally delivered the letter to Ryan, who said he would have to talk to Saunders. Neither Ryan or Saunders signed or otherwise responded to that letter.

Throughout May, Tackaberry continued his efforts to obtain a written agreement. During that time, Ryan and Saunders offered to pay him a $75,000 commission on an installment basis as they developed the property. Tackaberry refused to consider anything less than ten percent. Tackaberry testified that he had met with Ryan again on May 15th, but they were still unable to agree on the commission amount. Thereafter, Tackaberry testified, Ryan had ceased to return his phone calls, and he had cancelled a meeting scheduled for May 29th. On that date, Tackaberry drafted another letter, stating in part:

I have forestalled processing my paperwork on this transaction for almost a month in hopes that when I did process it the commission issue would be resolved.

\* \* \* \* \* \* \* \*

This complicates the issue in that I may not have as much flexibility in the manner of payment of the commission as I would have, had we resolved this issue prior to the file being processed.

On June 5th, Ryan and Tackaberry met once more to discuss the commission. Ryan offered Tackaberry $150,000, and Tackaberry again refused to consider less than $300,000. On June 26th, Ryan made Tackaberry a final offer of $150,000, which Tackaberry again refused. Tackaberry subsequently delivered to Ryan a bill for $325,000, ten percent of the final purchase price. On September 29, 1987, Ryan and Saunders closed on the property but did not pay Tackaberry for his services.

Weichert brought this action to enforce an alleged oral agreement between Tackaberry and Ryan for the payment of a ten percent brokerage fee, or, in the alternative, for damages based on *quantum meruit.* At trial, Kyritsis surprised counsel on both sides by testifying that he had agreed to sell the property to Saunders for $3,000,000 before Tackaberry had first contacted Ryan. Saunders testified and corroborated Kyritsis' testimony. Subsequent to that revelation, defendants argued that Tackaberry deserved no commission because he had not been the procuring cause of the sale.

The trial court found that Ryan and Saunders had contracted to pay Tackaberry a $300,000 broker's fee. The court first found that Tackaberry was the efficient and procuring cause of the sale, and expressly rejected Kyritsis' testimony that he had independently agreed to sell the property to Saunders:

It is not logical or credible that [Ryan and Saunders] would have their attorney * * * prepare a contract and later sign a revised contract * * * referring to Weichert as the only broker "entitled to commission," providing that "buyer agrees to pay any broker's commission due Weichert as per separate *agreement* between buyer and Weichert," (emphasis added) and further arranging to indemnify the sellers as to any commissions claims, unless Ryan and Saunders believed Weichert Realtors was the efficient cause of the sale.

The court also found that Ryan had orally contracted to pay Tackaberry a broker's fee totaling ten percent of $3,000,000 (the original price for the property), and that the statute of frauds did not apply to that oral contract. Finally, the court ordered Ryan and Saunders to pay interest on the commission beginning six months after the closing. Because the trial court found an enforceable contract, it did not reach the issue whether Weichert could recover on a *quantum meruit* theory.

The Appellate Division affirmed in an unpublished opinion, finding that Ryan had entered into a binding agreement with Weichert when he had availed himself of Tackaberry's services knowing that the broker expected a ten percent commission. Relying on section 69(1)(a) of the *Restatement (Second) of Contracts* (1981), the court concluded that although Ryan might have orally rejected the ten percent figure, he had

implicitly contracted to pay a ten percent commission because he took the benefit of Tackaberry's services with a reasonable opportunity to reject them.

## II

We consider two issues: whether Ryan and Tackaberry entered into an enforceable agreement, and, if not, whether Weichert is entitled to recover the reasonable value of Tackaberry's services on a theory of *quantum meruit.* A contract arises from offer and acceptance, and must be sufficiently definite "that the performance to be rendered by each party can be ascertained with reasonable certainty." *West Caldwell v. Caldwell,* 26 *N.J.* 9, 24–25, 138 *A.*2d 402 (1958); *Friedman v. Tappan Dev. Corp.,* 22 *N.J.* 523, 531, 126 *A.*2d 646 (1956); *Leitner v. Braen,* 51 *N.J.Super.* 31, 38–39, 143 *A.*2d 256 (App. Div.1958). Thus, if parties agree on essential terms and manifest an intention to be bound by those terms, they have created an enforceable contract. *See West Caldwell, supra,* 26 *N.J.* at 24–25, 138 *A.*2d 402; *Johnson & Johnson v. Charmley Drug Co.,* 11 *N.J.* 526, 539, 95 *A.*2d 391 (1953); *Knight v. New England Mutual Life,* 220 *N.J.Super.* 560, 565, 533 *A.*2d 55 (App.Div.1987), *certif. denied,* 110 *N.J.* 184, 540 *A.*2d 180 (1988); *Berg Agency v. Sleepworld–Willingboro, Inc.,* 136 *N.J.Super.* 369, 373–74, 346 *A.*2d 419 (App.Div.1975); *Hillsdale Nat'l Bank v. Sansone,* 8 *N.J.Super.* 497, 500, 73 *A.*2d 362 (Law Div.1950), *aff'd,* 11 *N.J.Super.* 390, 78 *A.*2d 441 (App.Div.1951); *California Natural v. Nestle Holdings,* 631 *F.Supp.* 465, 470 (D.N.J. 1986). Where the parties do not agree to one or more essential terms, however, courts generally hold that the agreement is unenforceable. *See, e.g., Heim v. Shore,* 56 *N.J.Super.* 62, 72–73, 151 *A.*2d 556 (App.Div.1959) (holding agreement unenforceable because parties did not agree on terms of payment, principal amount of mortgage, due date, and interest rate).

We have held that "[i]t is requisite that there be an unqualified acceptance to conclude the manifestation of as-

sent." *Johnson & Johnson, supra,* 11 *N.J.* at 539, 95 *A.*2d 391; *accord Looman Realty Corp. v. Broad St. Nat'l Bank,* 74 *N.J.Super.* 71, 82, 180 *A.*2d 524 (App.Div.), *certif. denied,* 37 *N.J.* 520, 181 *A.*2d 782 (1962). An offeree may manifest assent to the terms of an offer through words, creating an express contract, or by conduct, creating a contract implied-in-fact. *See Restatement (Second) of Contracts* § 19(1) (1981). Silence does not ordinarily manifest assent, but the relationships between the parties or other circumstances may justify the offeror's expecting a reply and, therefore, assuming that silence indicates assent to the proposal. *Johnson & Johnson, supra,* 11 *N.J.* at 539, 95 *A.*2d 391; 1 *Williston on Contracts* § 91 (3rd ed.1957). Section 69(1)(a) of the *Restatement (Second) of Contracts* provides:

> (1) Where an offeree fails to reply to an offer, his silence and inaction operate as an acceptance in the following cases only:
>
> (a) Where an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation.

▮ Thus, courts have held that when an offeree accepts the offeror's services without expressing any objection to the offer's essential terms, the offeree has manifested assent to those terms. *See, e.g., Ganley v. G & W Ltd. Partnership,* 44 *Md.App.* 568, 409 *A.*2d 761 (1980) (holding that broker's silence equalled acceptance of four percent commission where broker and principal had previously negotiated commissions in relation to purchase price, and principal had accepted buyer's low offer on broker's recommendation with condition that broker's commission would be four percent); *Moore v. Kuehn,* 602 *S.W.*2d 713, 717–19 (Mo.Ct.App.1980) (finding offeree's silence manifested acceptance when offeree instructed offeror to perform and did not contest proposed contract price); *Iacono v. Toll Bros.,* 225 *N.J.Super.* 87, 90–92, 541 *A.*2d 1085 (App.Div.) (finding offeree's silence and actions, which induced offeror's detrimental reliance, constituted acceptance), *certif. denied,* 113 *N.J.* 329, 550 *A.*2d 447 (1988). Accordingly, where an offeree gives no indication that he or she objects to any of the offer's

essential terms, and passively accepts the benefits of an offeror's performance, the offeree has impliedly manifested his or her unconditional assent to the terms of the offer.

In some circumstances, however, courts will allow recovery even though the parties' words and actions are insufficient to manifest an intention to agree to the proffered terms. Recovery based on *quasi*-contract, sometimes referred to as a contract implied-in-law, "is wholly unlike an express or implied-in-fact contract in that it is 'imposed by the law for the purpose of bringing about justice without reference to the intention of the parties.'" *Saint Barnabas Medical Ctr. v. County of Essex*, 111 *N.J.* 67, 79, 543 *A*.2d 34 (1988) (quoting *Saint Paul Fire & Marine Ins. Co. v. Indemnity Ins. Co.*, 32 *N.J.* 17, 22, 158 *A*.2d 825 (1960)); *accord West Caldwell, supra*, 26 *N.J.* at 28–29, 138 *A*.2d 402; *Insulation Contracting & Supply v. Kravco*, 209 *N.J.Super.* 367, 376, 507 *A*.2d 754 (App.Div.1986); *see also Callano v. Oakwood Park Homes Corp.*, 91 *N.J.Super.* 105, 108, 219 *A*.2d 332 (App.Div.1966) ("In the case of actual contracts, the agreement defines the duty, while in the case of *quasi*-contracts the duty defines the contract."). Courts generally allow recovery in *quasi*-contract when one party has conferred a benefit on another, and the circumstances are such that to deny recovery would be unjust. *See, e.g., Shapiro v. Solomon*, 42 *N.J.Super.* 377, 383–86, 126 *A*.2d 654 (App.Div. 1956); *Restatement of Restitution* § 53 (1937). *Quasi*-contractual liability "rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." *Callano, supra*, 91 *N.J.Super.* at 108, 219 *A*.2d 332.

Applying that principle, courts have allowed *quasi*-contractual recovery for services rendered when a party confers a benefit with a reasonable expectation of payment. *See, e.g., Hardin v. Hunter*, 174 *Ga.App.* 756, 331 *S.E.*2d 83, 85 (1985); *Kleinschmidt, Brassette & Assocs. v. Ayres*, 368 *So.*2d 1153 (La.Ct.App.1979); *Shapiro, supra*, 42 *N.J.Super.* at 384, 126 *A*.2d 654. That type of *quasi*-contractual recovery is

known as *quantum meruit* ("as much as he deserves"), and entitles the performing party to recoup the reasonable value of services rendered. *Marta v. Nepa*, 385 *A*.2d 727 (Del.1978); *Edens View Realty & Inv. v. Heritage Enters.*, 87 *Ill.App*.3d 480, 42 *Ill.Dec.* 360, 366, 408 *N.E.*2d 1069, 1075 (1980); 12 *Williston on Contracts* § 1459 (3rd ed.1970); E. Allan Farnsworth, *Contracts* § 2.20 (1982).

Accordingly, a broker seeking recovery on a theory of *quantum meruit* must establish that the services were performed with an expectation that the beneficiary would pay for them, and under circumstances that should have put the beneficiary on notice that the plaintiff expected to be paid. *Marta, supra*, 385 *A*.2d at 729; *Bellanca Corp. v. Bellanca*, 53 *Del.* 378, 169 *A*.2d 620, 623 (1961). Courts have allowed brokers to recover in *quantum meruit* when a principal accepts a broker's services but the contract proves unenforceable for lack of agreement on essential terms—for instance, the amount of the broker's commission. *See, e.g., Marta, supra*, 385 *A*.2d at 729; *Bellanca Corp., supra*, 169 *A*.2d at 620; *Hardin, supra*, 331 *S.E.*2d at 85; *Edens View Realty, supra*, 42 *Ill.Dec.* at 366, 408 *N.E.*2d at 1075; *Nardi & Co. v. Allabastro*, 20 *Ill.App*.3d 323, 314 *N.E.*2d 367 (1974); *Brakensiek v. Shaffer*, 203 *Kan.* 817, 457 *P*.2d 511 (1969); *Ham v. Morris*, 711 *S.W.*2d 187 (Mo.1986); *Bangle v. Holland Realty Inv.*, 80 *Nev.* 331, 393 *P*.2d 138 (1964); *cf. Traylor v. Henkels & McCoy, Inc.*, 99 *Idaho* 560, 585 *P*.2d 970 (1978) (holding that contractor could recover in *quantum meruit* where parties did not agree on price of services); *Alexis v. Pacaccio*, 410 *So*.2d 867 (La.App. 1982) (same). Thus, a broker who makes a sufficient showing can recover fees for services rendered even absent express or implied agreement concerning the amount of the fee.

### III

Application of the foregoing principles to the transaction between Weichert and Ryan demonstrates that the record

is insufficient to support a finding that Tackaberry and Ryan mutually manifested assent to the essential terms of the contract. First, Ryan never expressly assented to the terms of Tackaberry's offer. Although Ryan expressed interest in learning more about the Pitt property during the initial March phone call, neither his expression of interest nor his agreement to meet with Tackaberry to learn more about the transaction was sufficient to establish the "unqualified acceptance" necessary to manifest express assent. *See Johnson & Johnson, supra,* 11 *N.J.* at 539, 95 *A.*2d 391. Moreover, Ryan refused to agree to the ten percent figure during the April 4th meeting, and thereafter consistently rejected that term. Thus, the parties never formed an express contract.

The closer question is whether Ryan implicitly assented to Tackaberry's terms when he accepted information concerning the property and proceeded to act on that information. That Ryan's actions evinced a willingness to compensate Tackaberry is uncontested. Ryan accepted Tackaberry's services with a reasonable opportunity to reject them and with the knowledge that Tackaberry expected compensation. Moreover, Ryan admitted throughout the trial that he had intended to compensate Tackaberry.

As the Appellate Division noted, had Ryan remained silent after reading the April 3rd letter, such silence combined with his acceptance of Tackaberry's services might have been sufficient to manifest assent to the ten percent commission proposal. Ryan, however, was not silent when presented with Tackaberry's offer. He not only withheld his assent to the terms of the offer, declining to sign the April 3rd letter, but also expressed some reluctance about agreeing to pay the full commission on closing. Shortly after the April 4th meeting, Ryan stated that a ten percent commission was too high, and he consistently sought to negotiate that term. In fact, the record indicates that Tackaberry was not sure that Ryan had assented to the ten percent fee, accounting for his persistent attempts to induce Ryan to indicate his acceptance in writing.

Although the trial court concluded that the proofs were sufficient to establish agreement to pay the full commission, the court made no findings of fact inconsistent with the evidence of Ryan's rejection of the ten percent commission. In our view, the circumstances surrounding their negotiations did not justify Tackaberry's belief that Ryan had assented to the terms of his offer.

The Appellate Division's conclusion that Ryan had agreed to pay the ten percent commission was based on its assumption that section 69 of the *Restatement (Second) of Contracts* "does not require that the offeree agree with the expected compensation, but takes the benefit of the services with a reasonable opportunity to reject them." We are persuaded, however, that proof of "silence and inaction"—the indispensable predicate to a finding of acceptance under section 69—cannot be found in this record. Ryan's initial unwillingness to agree to the ten percent commission, and his subsequent express rejection of that term, hardly constitutes the passive acquiescence to an offer contemplated by section 69. Implication of an agreement to pay Weichert a ten percent commission under those circumstances would impermissibly expand the rule allowing an offeror to treat silence as acceptance.

Arguably, Tackaberry should have cemented the terms of the agreement before conferring the benefit of his services. We note that in the ordinary real estate brokerage transaction in which the seller pays the commission, the broker's right to payment depends on the existence of a writing specifying the rate or amount of the commission. *See N.J.S.A.* 25:1–9. Although a writing is not mandated in transactions in which the buyer pays the commission, Tackaberry's testimony was consistent with the common understanding that real estate brokerage agreements ordinarily are committed to writing. In proceeding to render services despite Ryan's refusal to agree, either in writing or orally, to an essential term, Tackaberry apparently elected to pursue consummation of the transaction on the assumption that Weichert's fee would eventually be paid.

That choice, although perhaps commercially reasonable, did not result in the formation of a binding contract because the parties had never agreed on the amount of the fee. *See, e.g., Hardin, supra,* 331 *S.E.*2d at 85; *Traylor, supra,* 585 *P.*2d at 972; *Brakensiek, supra,* 457 *P.*2d at 514; *Alexis, supra,* 410 *So.*2d at 868. Thus, Ryan's implied promise to pay a commission is unenforceable because of the parties' failure to agree on the amount of the commission.

The record clearly establishes, however, that Tackaberry is entitled to recover in *quantum meruit* for the reasonable value of his services. The trial court's factual finding that Tackaberry was the procuring cause of the sale is supported by substantial evidence. Further, the proofs adduced at trial firmly establish that Tackaberry furnished Ryan with information about the Pitt property with an expectation that Ryan would pay a brokerage fee, and Ryan himself admitted throughout the trial that he had always intended to compensate Tackaberry for his services. Given those circumstances, to deny Tackaberry compensation for services rendered would unjustly enrich Ryan and Saunders. *See Shapiro, supra,* 42 *N.J.Super.* at 383–84, 126 *A.*2d 654.

Accordingly, we remand to the Law Division to determine the reasonable value of Tackaberry's services. By remanding, we do not imply that the reasonable value of Tackaberry's services is less than ten percent of the purchase price, nor do we imply any view concerning the value of such services. The commission amount should be determined on the basis of proofs tending to show the reasonable value of Tackaberry's services, including evidence of customary brokers' fees for similar transactions. *See Bellanca Corp., supra,* 169 *A.*2d at 626; *Sappa v. Strite–Anderson Mfg. Co.,* 300 *Minn.* 116, 221 *N.W.*2d 660, 663 (1974); 12 *Am.Jur.*2d *Brokers* § 253 (1964).

We modify the judgment of the Appellate Division and remand to the Law Division to determine the amount of plaintiff's recovery based on principles of *quantum meruit.*

442

*For modification and remandment*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, O'HERN, and GARIBALDI—5.

*Opposed*—None.