Lenk, J.
This is a disputed settlement petition. The total settlement is in the amount of $750,000 between the plaintiff, Vernon M. McCaughey (“McCaughey”) and the defendants. The worker’s compensation lien holder, Crum & Forster, contests the distribution of the settlement monies, claiming that it is not receiving its full statutory share.
The underlying case is as follows. The plaintiff, Vernon M. McCaughey, suffered serious injuries to his right leg in a work-related[2] accident which took place on August 29, 1988.[3] McCaughey was injured when his leg was caught between a granite stairway and the bumper of his company car, a 1988 Buick Century. The plaintiff sued General Motors for breach of warranty[4] and also sued his wife, defendant Hildegard McCaughey, based on her alleged negligence in attempting to stop the car’s forward movement.
The specifics of the dispute are as follows. The plaintiffs attorney, Anthony Tarricone, argues that, under an agreement between Tarricone’s firm and Crum & Forster, one third of the $750,000 settlement (or $250,000) is to be allotted to Tarricone’s firm; further, Tarricone argues, after the payment of fees and expenses Crum & Foster is to take one third of the remaining “net” settlement ($161,414.47). For its part, Crum & Foster argues that it is entitled to a total of $211,141.52.[5] Thus, there is a discrepancy of $49,727.05 in the amounts each party believes it is entitled to.
On June 24, 1994 the parties argued these motions before me in Worcester Superior Court. Three witnesses took the stand and were examined by the attorneys for the parties.[6] Below are the court’s findings of fact, rulings of law, and order for judgment. The evidence supports the inferences which I draw and the findings which I make.
FINDINGS OF FACT
1. At all times the plaintiff, Vernon M. McCaughey, has been represented by the law firm of Sarrouf, Tar-ricone & Flemming of Boston, Massachusetts. Anthony Tarricone (‘Tanricone”) has served as lead trial counsel.
2. Defendant Hildegard McCaughey was represented by John Wickstrom of the Worcester law firm ofTashjian, Simsarian & Wickstrom and by Anthony Fredella of Fredella&WheelerofSomerville, Massachusetts. Defendant General Motors was represented by David Rogers of the Boston law firm of Campbell & Associates.
3. The worker’s compensation lienholder, Crum & Forster, is represented by the law firm of Keches & Mallen, Taunton, Massachusetts. Attorney Philip C. Amaru is assigned to this case.
4. In January of 1994 plaintiffs attorney, Anthony Tarricone contacted Crum & Forster’s adjuster, Mary Saquet (“Saquet”), to discuss the resolution of the sub-rogation claim related to this products liability suit.
5. On January 19, 1994 Tarricone met with Saquet in her office. Tarricone proposed that Crum & Forster agree to accept one third of the net settlement reached in the third-party action (which amount would be in full satisfaction of the worker’s compensation claim).[7] Saquet said she would respond with an answer to the proposal.[8]
6. Within a few days’ time Saquet asked Tarricone to promise that no part of the settlement would be allocated to a loss of consortium claim if the proposal was accepted.
7. In a letter dated March 21, 1994 (Exhibit 2) Attorney Carlin J. Phillips[9] wrote Tarricone that:
Crum & Forster will agree to take a total net one-third (i/3) of any settlement while retaining any and all rights under the Hunter decision. In addition, this agreement is contingent upon your forwarding of a written verification of your prior oral communications to Crum & Forster that you will not be allocating any part of a settlement to the loss of consortium claim. (Emphasis added.)
In this letter no. mention was made of any “gross” settlement.
8. Tarricone understood this letter as an acceptance of his proposal. However, since he was concerned that the reference to a “total net one third (VS)” was not sufficiently clear, he called both Phillips and Saquet to discuss that language. When Tarricone received no return call from Phillips or Saquet by March 30, 1994, Tarricone sent a letter to Phillips to confirm the agreement that Crum & Forster would take one third of the net settlement (that is, the settlement after fees and expenses were deducted) and that there would be no consortium allocation (as requested by Phillips in his March 21,1994 letter). This letter was sent by telecopier to both Mr. Phillips and Ms. Saquet.[10]
9. On April 1, 1994 Attorney Philip Amaru (“Amaru”) of Keches & Mallen attended the mediation of behalf of Crum & Forster. When the mediator asked if there existed an agreement regarding the subrogation claim, Tarricone (in the presence of Crum & Forster’s attorney) stated that there was such an agreement. At no time during the mediation did Amaru, as Crum & Forster’s representative, deny the existence of the agreement or indicate that the agreement was in any way other than as it was stated in the letter of March 30, 1994.
10. During the next several weeks defendants offered several settlement figures, all of which were *487 rejected. Finally, on May 24, 1994 the plaintiff agreed to a settlement of $750,000.[11]
11. In the eight weeks following Tarricone’s March 30, 1994 letter neither Crum & Forster nor any of its representatives raised an issue as to the distribution agreement as set forth in the March 30, 1994 letter.
12. On May 28,1994Attorney Eric Parker of Sarrouf, Tarricone & Flemming telephoned Maiy Saquet to discuss the settlement calculations under the Hunter decision.[12] During that conversation Saquet raised for the very first time the issue of the amount of Crum & Forster’s payment under the settlement.
13. I find the testimony of Attorney Anthony Tar-ricone, counsel for the plaintiff Vernon M. McCaughey, to be credible and I accept such testimony regarding the events leading up to the settlement of the Mc-Caughey case.
14. Although the evidence might permit a contrary finding, I do not find credible the testimony of Mary Saquet, adjuster for Crum & Forster. I do not accept or believe Ms. Saquet’s testimony on the issue of whether she received or had knowledge of Mr. Tarricone’s March 30, 1994 letter.
15. I find that the parties entered into a contract. Tarricone’s proposal to Mary Saquet in her office of January 19,1994 constituted the offer and this offer was accepted through Carlin Phillips’s letter of March 21, 1994. Moreover, the contract terms were confirmed by Tarricone’s letter of March 30, 1994. For two months Crum & Foster — the party which now contests the agreement — never registered disagreement as to the terms of the contract. This is in spite of the fact that Crum & Forster actively participated in the mediation.
16. I find that Tarricone reasonably relied on this perceived acceptance of the contract and geared his negotiations accordingly. For example, because he had agreed to forego allocating a portion of the settlement for loss of consortium, he refrained from further negotiations in this area. I find that, had Tarricone known that Crum & Forster would dispute the agreement, he would have exercised his right to negotiate for a higher settlement figure.
17. I find that during the two-month period from March 30 to May 28 Crum & Forster — through its representatives at Keches & Mallen and through its own representative Mary Saquet — knew that it was a party to an agreement as to the distribution of the settlement.
RULINGS OF LAW
In spite of Crum & Forster’s arguments to the contrary, the parties entered into a legally binding contract. Attorney Phillips’s letter of March 1, 1994 constituted explicit acceptance of the terms set forth in Tarricone’s offer to Mary Saquet on January 19, 1994.
Even assuming arguendo that a contract was not entered into at this time, it is significant that: (1) Attorney Amaru (legal counsel to Crum & Forster) acknowledged to the mediator on April 1, 1994 that an agreement had been reached; and (2) both Crum & Forster (through Mary Saquet) and its legal counsel (through Keches & Mallen) were mum as to any alleged disapproval of the terms presented in both Carlin and Tarricone’s letters for a full two-month period. This behavior on Crum & Forster’s part is clearly probative of the existence of an agreement. Having arrived at such an agreement, Crum & Forster had reason to know that Tarricone and his client reasonably relied on its terms. Accordingly, Tarricone (on behalf of his client) forewent the opportunity to allocate any portion of the settlement to loss of consortium. Tarricone argues, and this court agrees, that had plaintiffs counsel known that Crum & Forster disputed the terms of the contract, Tarricone would not have settled for $750,000; rather, he would have encouraged his client to negotiate for a larger amount.
In spite of the existence of a contract, Crum & Forster now claims that it is entitled to the full reimbursement of its worker’s compensation lien as a statutory right. Citing the Rhodes decision, Crum & Forster argues that Massachusetts courts have consistently recognized an insurer’s right to full reimbursement of benefits. Rhodes v. Beacon Sales Co., 416 Mass. 14, 16 (1993). Rhodes, however, is inapposite. In that case, the court held that a Superior Court judge had no discretionary power to order an equitable reduction of the sum to be recovered by the insurer. In Rhodes, however, unlike in the instant case, there was no agreement between the plaintiff and the insurer. In Rhodes, the plaintiff argued that the insurer should receive a reduced share of the settlement money; the plaintiffs argument was not grounded in a contract theory (as it is in the present case); rather, the plaintiff argued that since he was recovering only a fraction of the value of his injuries, the insurer should only recover an amount proportional to the amount the settlement bore to the actual value of the injuries.[13] Rhodes, 416 Mass. at 16 (1993). The facts of Rhodes clearly are dissimilar to those of the present case, and the Rhodes decision provides no support for Crum & Forster’s position.
Moreover, Crum & Forster rather audaciously argues that the correspondence exchanged between Tar-ricone and Keches & Mallen were merely letters and failed to constitute a binding agreement.[14] Further, Crum & Forster argues[15] that because “silence does not constitute acceptance” as a general rule, its utter lack of negative reaction for a period of two months cannot be perceived as acceptance of the contract.
While such a statement may hold water as a cursory “general” rule, the conclusion Crum & Forster suggests is clearly wrong. Indeed, Massachusetts courts do recognize the notion of “acceptance by silence” when the surrounding circumstances justify the conclusion that silence is assent. Quite recently in Polaroid Corp. v. Rollins Environmental Services (NJ), Inc., 416 Mass. 684 (1993), the Supreme Judicial Court noted that:
*488 Although silence does not ordinarily manifest assent, the relationship between the parties or other circumstances may justify the assumption that silence indicates assent to the proposal. Weichert Co. Realtors v. Ryan, 128 N.J. 427, 436 (1992). Moreover, when an offeree accepts the offeror’s services without expressing any objection to the offer’s essential terms, the offeree has manifested assent to those terms. Id. Polaroid Corp. v. Rollins Environmental Services (NJ), Inc., 416 Mass. 684, 690-91 (1993).
According to the holding of Polaroid v. Rollins, Crum & Forster clearly manifested assent to the terms of the settlement as articulated in Carlin Phillips’s letter and as confirmed and clarified in Tarricone’s letter.
ORDER
For the above-stated reasons, it is hereby ORDERED that Vernon M. McCaughey’s motion for approval of settlement be ALLOWED.
It is therefore ORDERED that the settlement proceeds be distributed according to the plan submitted by plaintiffs counsel.

 At the time the plaintiff worked as a Senior Field Representative for the Massachusetts Housing Finance Agency.

 At this time McCaughey was working as a Senior Field Representative for the Commonwealth of Massachusetts Housing Finance Agency.

 This claim was premised on: (1) the mis-synchronization of the transmission and, (2) the transmission lever/indicator assembly.

 This is calculated as the total lien of 326,781.07 minus one third of the attorneys fees minus 43% of the total expenses.

 Those witnesses are: Attorney Anthony Tarricone, Mary Saquet (Crum & Forster’s adjuster), and Attorney Carlin Phillips (formerly counsel to Crum & Forster).

 Tarricone explained to Saquet that the term “net settlement” meant the amount remaining after deduction of attorneys fees and expenses. Thus after the deduction of attorneys fees and expenses one third of the settlement would be turned over to Crum & Forster and two thirds would be turned over to the plaintiff.

 This was the proposal discussed between Tarricone and a representative of Crum & Forster.

 Of Crum & Forster’s law firm, Keches & Mallen.

 Ms. Saquet testified that prior to June 1994 she had not seen Tarricone’s March 30, 1994 letter. Saquet testified to this in spite of the fact that the letter was sent directly to her from Tarricone and the fact that Crum & Forster’s counsel at the time (Phillips) usually sent her copies of all correspondence.

 Under this settlement offer, General Motors would pay $500,000 and defendant Hildegard McCaughey’s insurer would pay $250,000.

 Hunter v. Midwest Coast Transport, Inc., 400 Mass. 779 (1987).

 The plaintiff claimed that the judge, under G.L.c. 152 section 15, had the authority to order such a reduction.

 Moreover, Crum & Forster somewhat disingenuously argues that even if the “negotiations” could be deemed a contract, they are void due to mutual mistake.

 For this proposition, Crum & Forster cites the 1876 decision in Day v. Canton, 119 Mass. 513.