**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0451-22

IN THE MATTER OF THE
ESTATE OF DORIS SPITZ-
OOSSE, deceased.

_____

Argued February 6, 2024 – Decided April 10, 2024

Before Judges Whipple, Enright and Paganelli.

On appeal from the Superior Court of New Jersey, Chancery Division, Bergen County, Docket No. P-000374-21.

Craig S. Provorny argued the cause for appellant Brian Spitz (Herold Law, PA, attorneys; Craig S. Provorny, of counsel and on the briefs; Mikhail Sterlin, on the briefs).

Lawrence Andrew Joel argued the cause for respondent Sheryl Held (Joel and Joel, LLP, attorneys; Lawrence Andrew Joel, of counsel and on the brief; Richard A. Joel, on the brief).

PER CURIAM

Brian Spitz appeals from an August 31, 2022 order dismissing his counterclaims for breach of an oral contract and unjust enrichment following a two-day bench trial. We affirm.

This matter concerns a family dispute involving Brian's[1] claims against his mother's, Doris Spitz-Oosse's, estate. The executrix of the estate is Sheryl Held, Brian's sister and Doris's daughter. At trial, Brian; his wife, Kimberly; and his uncle, Murray, testified on Brian's behalf. Sheryl testified on behalf of the estate.

We glean the facts and procedural history from the trial court record. For a time, the family resided in Paterson (Paterson Property) and eventually moved to Fair Lawn (Fair Lawn Property). When the family moved to the Fair Lawn Property, Doris retained the Paterson Property as a rental property.

In 1980, Doris and Brian's uncle, Solomon, started a company called Karroni Corporation.[2] Karroni was a property management company—holding and renting properties. Brian testified he worked for Karroni from the age of sixteen or seventeen to the age of twenty-one; from 1982 through 1987. He

---

[1] Since Brian shares the same surname as other individuals involved in this matter, we use first names for the parties, as well as other individuals named in the opinion. No disrespect is intended.

[2] The record reflects two spellings: "Karroni" and "Karoni."

A-0451-22

claimed Doris "verbally promised [him] a [ten percent] future interest in Kar[r]oni . . . in exchange for his work," but she later told him "they were not going to honor the ten percent." Brian testified he left Karroni in 1987 because, among other reasons, he had not received an ownership interest. Nonetheless, Brian explained he returned to Karroni in 1988 for six months. He later left the company after being injured.

Brian testified he again returned to Karroni in 1992 after Solomon's death. He explained a Karroni property located in Irvington (Irvington Property), had 800 Department of Community Affairs (DCA) violations. There was no written evidence of the violations produced at trial. Brian claimed he returned to Karroni to handle the violations. He explained:

> What [Doris] was doing was, she told me that, since she could not afford to pay me, because it had to be put back into the building for renovation work to abate the violations and satisfy the DCA, that she would leave me the Paterson [P]roperty that I grew up in as compensation. . . .
>
> So me and [Doris] came up with the agreement and she offered that she would leave me the property. And, I said, since you[ are] deriving income from it, I go, I do[ no]t want you to turn the property to me immediately. I go, you can leave me the property in your [W]ill when you pass. This way you[ wi]ll have no need for the assets. And the other part of the agreement was that, if she decided she did[ not] want to keep the property any

3

longer and sold the property, she would turn the proceeds over to me.

Brian testified that he "would[ no]t have been able to" go back to Karroni "without compensation if [he] had not been promised the Paterson [P]roperty in the [W]ill or the proceeds of the sale." Brian contends he received no pay, money or compensation between 1992 and 2000. He also testified that he never received "payment vouchers or pay stubs"; 1099s; or W-2s from Karroni.

Kimberly testified that Brian returned to work for Karroni without pay and she and Brian lived off of her salary. She also testified she understood Brian would be compensated with the Paterson Property. She stated she never had any discussion with Doris about the purported agreement.

Uncle Murray testified he knew "there was some sort of agreement" but he did not know the details. He stated there "was just an understanding that there[ wa]s this whole kind of notion of sweat equity; that [Brian would] put in a lot of time and effort and . . . eventually be rewarded for that." Further, Uncle Murray testified he thought "probably [Doris] mentioned it" and "[p]otentially at some point Brian mentioned it." He did not recollect the details and explained Doris generally talked about business but she "certainly" did not talk to him about details.

4

Sheryl testified she was not involved with and never worked for Karroni but recalled conversations about Karroni around the house. She stated there was never an agreement or oral contract between Doris and Brian, and that Brian "just conjured [it] up."

Brian testified that he and Doris had no further discussions from 1992 through 2000 about her leaving him the Paterson Property. However, he stated they spoke about her Will on several occasions. He requested to see "excerpts" of the Will, to confirm she kept her word; or "permission to contact her attorney to find out [w]hat was done and she did have a [W]ill in effect." Doris did not comply with these requests.

The Irvington Property was sold in 2000 for $200,000. Brian explained he received some of the money left after the sale of the Irvington Property. Also, he testified that Doris told him "she was very grateful to [him] for helping her," and he could take the money in their Karroni account "as a small token." However, he explained Doris later took some of the money, so he only received a "portion of it."

Moreover, Brian testified that since Doris kept putting him off about her Will, he distanced himself from her. He explained he severed their relationship and had no contact with Doris from 2000 to 2009. Brian testified he rekindled

5

his relationship with Doris in 2009, and he and Doris had a normal relationship from 2009 through 2019.

In September 2018, Doris executed a Last Will and Testament (2018 Will). She "revoke[d] all prior Wills and Codicils" and "specifically devise[d]" the Paterson Property to Brian. There was no mention of the devise being part of an oral contract with Brian. Doris also devised the Fair Lawn Property to Sheryl. Although Brian never saw the 2018 Will until after Doris's passing, he understood the Will reflected his agreement with Doris.

Sheryl testified Doris:

> always said she was fortunate to have two houses. She had two children. She was going to ask her son which house he wanted so there would be no problems. Brian said Paterson. [Doris] said fine. That's from my mother's own mouth.

In August 2019, Brian met with Doris and demanded that she show him her Will. He explained he needed to write out his side of the conversation because Doris was "extremely deaf." The writing provided:

> How are you feeling? I know you fell in the bathroom, I let Murr[a]y + Jane know!
>
> Kim and the girls want me to come stay here for a week or two to try to get you back on track! Also [three] times a day is not enough for checking you[r] sugar! But it's better than once a day[.]

I'm going to give you something to read and I need an answer before I leave, remember I don't want to see anything bad to happen to you and I want to help you we're all concerned about you and your health!!!

I'm sorry to have to bring this up but have you really done your [W]ill as you told me you have!

Because if not we need to attend to it so me and your daughter don't have issues!!!

****[3]

That is not what you said it was supposed to be Fair Lawn house 50/50 and Paterson house 100% me.

Please be honest what you said just now was that Fair Lawn was 100% hers and I get Paterson.

****

Thank you cause I just don't want the extra stress of fighting with them and who is executor!

I'm sorry I have to do this but over the course of your illness you've told me several different things on top of the list is your [W]ill as per our talks over the years[.] [Y]ou have told me several different versions of your [W]ill but have never shown me it, as you had agreed to. At this point because of your past track record of keeping your word, you need to do as you promised and prove that you actually did what you said you would! If you[ are] not going to actually prove it[,] today will be the last day you see me!!! I'm sorry but I can't trust you!!! I'll give you till Friday morning to do so! If you have no intention of doing this tell me now.

---

3  "****" reflects an apparent gap in the conversation.

A-0451-22

Doris never showed Brian her Will. Brian and Doris never saw each other or communicated with one another after the August 2019 meeting.

Sheryl testified that following Doris and Brian's conversation, Doris called her crying, and she went to Doris's house. Sheryl explained she exchanged text messages with Brian in the presence of Doris. Brian testified he did not explain what was going on with Doris in the messages. He testified that Sheryl was never part of the business and he was not going to bring her into something Doris could explain.

However, in one of the text messages Brian stated:

> Write on a piece of paper to tell you what our agreement was I have nothing to hide you can even ask [Uncle] Murray because he was the one who [t]ried to act kind[ of] like a moderator.

Sheryl responded with:

> All right, is this about houses. Truth is, she has two houses and two children. She told me she asked you what house you wanted and you said Paterson.

Sheryl continued:

> She said she did[ no]t promise you anything when I asked her.

Brian responded:

A-0451-22

> Very well tell her no matter what she is my mother and I wish her no harm but tonight was the last time I[ wi]ll be over.

In October 2019, Doris executed another Last Will and Testament (2019 Will) providing she "revoked all prior Wills and Codicils" and "intentionally made no provision . . . for . . . [Brian] and [her] daughter-in-law . . . and specifically disinherit[ed] them, not for lack of love and affection but for personal reasons known only to [her]."

Sheryl testified Doris

> changed the [W]ill because basically throughout [her] life and when [Doris] really needed [Brian], he was not around. . . . [Doris] reflected and decided to change her [W]ill. Because she did[ no]t want [Brian] to have anything because of the way he treated her his whole life.

In April 2021, Doris sold the Paterson Property. Sheryl and Uncle Murray testified Doris did not want Brian to know about the sale. Sheryl explained Brian and Doris were estranged and Doris was afraid of Brian's reaction. Uncle Murray testified Doris did not tell him why she did not want Brian to know about the sale. Brian was unaware of the sale of the Paterson Property and did not receive the sale proceeds. On May 27, 2021, Doris passed away, leaving the 2019 Will in place.

9

In June 2021, Brian filed a caveat against the granting of letters testamentary or the admitting to probate of the 2019 Will. In July 2021, Sheryl filed a verified complaint for probate of the 2019 Will and removal of the caveat. The Deputy Surrogate executed an Order to Show Cause requiring parties of interest to appear and show cause why a judgment should not be entered: (A) admitting the 2019 Will to probate; (B) appointing Sheryl as executrix of the Estate of Doris, subject to qualification with the Bergen County Surrogate; and (C) removing the caveat.

In September 2021, Brian filed an answer to the complaint and a counterclaim alleging two counts—undue influence and lack of capacity. In January 2022, he filed an amended answer and counterclaim to include counts for breach of oral contract and unjust enrichment. In July 2022, the undue influence and lack of capacity counts were dismissed from Brian's counterclaim, by stipulation, and the caveat was withdrawn. The remaining counts, breach of an oral contract and unjust enrichment, were tried on August 2 and 3, 2022.

In assessing the trial testimony, the judge stated he was able to observe the witnesses and their demeanor. He stated he understood the testimony would be, "in a family sort of way," "slanted or tilted or bias[ed] in one direction," because "[e]verybody ha[d] their own self-interest."

In addition to the testimony, the judge considered the writing from Brian and Doris's conversation in August 2019, and stated the writing did not mention the purported contract. Further, he noted Brian's writing stated, "you have told me several different versions," and questioned why Brian would have mentioned "several different versions if they had an oral contract."

Further, the judge reviewed Brian and Sheryl's text messages. He also reviewed the 2018 Will and stated it only revealed a "donative intent" and did not mention a contract or agreement.

Applying the "clear and convincing" burden of proof, the judge determined:

> There is nothing that I could find that even evidences this agreement, much less by clear and convincing evidence.

On appeal, Brian contends the judge erred by: (1) applying the wrong standard of proof; (2) not finding an oral contract between him and Doris, and failing to find Doris breached the contract by not providing him with the proceeds of the sale of the Paterson Property; and (3) ignoring his claim of unjust enrichment.

Appellate courts apply a deferential standard in reviewing factual findings by a judge. Balducci v. Cige, 240 N.J. 574, 594 (2020); State v. McNeil-

Thomas, 238 N.J. 256, 271 (2019).  In an appeal from a non-jury trial, appellate courts "give deference to the trial court that heard the witnesses, sifted the competing evidence, and made reasoned conclusions."  Griepenburg v. Twp. of Ocean, 220 N.J. 239, 254 (2015).  "The general rule is that findings by a trial court are binding on appeal when supported by adequate, substantial, credible evidence."  Gnall v. Gnall, 222 N.J. 414, 428 (2015) (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)).  Further, ordinarily, appellate courts should not disturb a trial court's credibility findings.  See Mountain Hill, LLC v. Twp. Comm. of Twp. of Middleton, 403 N.J. Super. 146, 193 (App. Div. 2008) (citations omitted) ("[Appellate courts] are not in a good position to judge credibility and, ordinarily, should not make new credibility findings.").

"A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference."  Rowe v. Bell & Gossett Co., 239 N.J. 531, 552 (2019) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).  Therefore, "[w]hether the facts found by the trial court are sufficient to satisfy the applicable legal standard is a question of law subject to plenary review on appeal."  State v. Cleveland, 371 N.J. Super. 286, 295 (App. Div. 2004).

"A contract arises from offer and acceptance, and must be sufficiently definite 'that the performance to be rendered by each party can be ascertained with reasonable certainty.'" Weichert Co. Realtors v. Ryan, 128 N.J. 427, 435 (1992) (citations omitted). "Thus, if parties agree on essential terms and manifest an intention to be bound by those terms, they have created an enforceable contract." Ibid. (citations omitted). Where the parties do not agree to one or more essential terms, however, courts generally hold that the agreement is unenforceable. Ibid. (citations omitted).

To establish a claim for breach of contract, a party must prove four elements:

> first, that the parties entered into a contract containing certain terms; second, that [the] plaintiff did what the contract required [the plaintiff] to do; third, that [the] defendant did not do what the contract required [the defendant] to do, defined as a breach of the contract; and fourth, that [the] defendant's breach, or failure to do what the contract required, caused a loss to the plaintiff.
>
> [Woytas v. Greenwood Tree Experts, Inc., 237 N.J. 501, 512 (2019) (alterations in original) (quoting Globe Motor Co. v. Igdalev, 225 N.J. 469, 482 (2016)).]

"To establish a claim for unjust enrichment, 'a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust.'" Iliadis v. Wal-Mart Stores, Inc., 191 N.J. 88, 110

(2007) (quoting <u>VRG Corp. v. GKN Realty Corp.</u>, 135 N.J. 539, 554 (1994)). "That quasi-contract doctrine also 'requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights.'" <u>Ibid.</u> (quoting <u>VRG Corp.</u>, 135 N.J. at 554.

Brian argues the judge erred by applying the wrong burden of persuasion at trial. He contends: (1) "the trial court applied a much higher burden of proof to its analysis of the existence of a contract between [Brian] and [Doris] than the 'clear and convincing' standard set forth in N.J.S.A. 2A:81-2"; and (2) the trial court abused its discretion by applying an incorrect burden of proof, "clear

and convincing,"[4] instead of the required "preponderance of the evidence"[5] standard that applies when there is performance of an agreement; relying on Deutsch v. Budget Rent-A-Car, 213 N.J. Super. 385 (App. Div. 1986). These arguments are unavailing.

---

[4] Clear and convincing evidence is evidence that produces in your mind[] a firm belief or conviction that the allegations sought to be proved by the evidence are true. It is evidence so clear, direct, weighty in terms of quality, and convincing as to cause you to come to a clear conviction of the truth of the precise facts in issue. The clear and convincing standard of proof requires that the result shall not be reached by a mere balancing of doubts or probabilities, but rather by clear evidence which causes you to be convinced that the allegations sought to be proved are true.

[Model Jury Charges (Civil), 1.19, "Burden of Proof—Clear and Convincing Evidence" (rev. Aug. 2011).]

[5] The term "preponderance of the evidence" means that amount of evidence that causes you to conclude that the allegation is probably true. To prove an allegation by the preponderance of the evidence, a party must convince you that the allegation is more likely true than not true. If the evidence on a particular issue is equally balanced, that issue has not been proven by a preponderance of the evidence. Therefore, the party having the burden of proving that issue has failed with respect to that particular issue.

[Model Jury Charges (Civil), 1.12H, "Preponderance of the Evidence" (approved Nov. 1998).]

Initially, on both days of trial, Brian's counsel confirmed the applicable standard of proof was by "clear and convincing evidence." Counsel did not limit the application of the standard to particular issues or claims. On appeal, Brian argues any "contention the parties stipulated to a standard of 'clear and convincing evidence' for the entire case . . . is contrary to the record," citing to his post-trial "proposed findings of fact and conclusions of law." Our review of the post-trial submittal does not reveal Brian sought to apply the lesser burden. Instead, he contended the estate's Statute of Frauds (SOF) argument "may not apply" or Brian and Doris's purported agreement might be outside the SOF because of Brian's performance. We are satisfied Brian did not raise the issue of varying burdens of proof at trial. Moreover, we conclude, as we explain below, the argument is unavailing because Brian's burden of persuasion was by "clear and convincing" evidence as a matter of law.

The Dead Man's Act, N.J.S.A. 2A:81-2, provides:

> In a civil action that is commenced or defended . . . by a personal representative on behalf of a decedent, any other party who asserts a claim or an affirmative defense against the . . . personal representative, that is supported by oral testimony of a promise, statement, or act of . . . the decedent, shall be required to establish the same by <u>clear and convincing proof</u>.
>
> [(emphasis added).]

16

Therefore, under the Dead Man's Act, Brian's burden of persuasion—as to the alleged oral contract between him and Doris, and his claim for unjust enrichment—was by "clear and convincing proof."

In addition, Brian's claim for contractual compensation, based either on the transfer to him of the Paterson Property or the payment to him of the proceeds of the sale of the Paterson Property, implicates the "clear and convincing" standard under the SOF.

Under N.J.S.A. 25:1-13:

> An agreement to transfer an interest in real estate or to hold an interest in real estate for the benefit of another shall not be enforceable unless:
>
> a. a description of the real estate sufficient to identify it, the nature of the interest to be transferred, the existence of the agreement, and the identity of the transferor and transferee are established in a writing signed by or on behalf of the party against whom enforcement is sought; or
>
> b. a description of the real estate sufficient to identify it, the nature of the interest to be transferred, the existence of the agreement and the identity of the transferor and the transferee are proved by <u>clear and convincing evidence</u>.
>
> [(emphasis added).]

A-0451-22

Therefore under N.J.S.A. 25:1-13(b), Brian's burden of persuasion to establish Doris orally agreed to "transfer an interest" or to "hold an interest" in the Paterson Property for him was by "clear and convincing evidence."

We recognize Brian argues his oral agreement with Doris dates to 1992. At that time, the SOF provided:

> No action shall be brought upon any of the following agreements or promises, unless the agreement or promise, upon which such action shall be brought or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or by some other person thereunto by him lawfully authorized:
>
> . . . .
>
> d.  A contract for sale of real estate, or any interest in or concerning the same.
>
> [N.J.S.A. 25:1-5.]

While the predecessor statute, N.J.S.A. 25:1-5, was silent on the evidential burden, our courts required evidence by the "clear and convincing" standard. See Aiello v. Knoll Golf Club, 64 N.J. Super. 156, 164 (App. Div. 1960).

Nonetheless, Brian argues the "'preponderance of the evidence' standard . . . applies when there is part performance of an agreement" and under Deutsch, "[t]he appropriate standard for proving a contract that has been fully performed by one of the parties is 'preponderance of the evidence.'" This argument fails.

A-0451-22

In <u>Epstein v. Fleck</u>, the court stated:

> In every case, in order to take the case out of the [SOF] on the ground of part performance, irrespective of other questions, two things are requisite: [t]he terms of the contract must be established by the <u>proofs to be clear, definite, and unequivocal,</u> and the acts relied on as part performance must be exclusively referable to the contract.
>
> [141 N.J. Eq. 486, 488 (E. & A. 1948) (emphasis added) (quoting <u>Cooper v. Colson</u>, 66 N.J. Eq. 328, 330 (E. & A. 1904)).]

Similarly, in <u>Young v. Sabol</u>, the court held "[t]he obligation of plaintiff [wa]s to prove by clear, cogent and convincing evidence an oral agreement . . . . such [that] part-performance . . . [would] exclude the operation of the [SOF]." 4 N.J. 309, 312 (1950) (citing <u>Epstein</u>, 141 N.J. Eq. at 486; <u>White v. Risdon</u>, 140 N.J. Eq. 613, 614-15 (Ch. 1947); <u>Poloha v. Ruman</u>, 137 N.J. Eq. 167 (Ch. 1945); <u>Hufnagel v. Scholp</u>, 138 N.J. Eq. 16 (Ch. 1946); <u>Laune v. Chandless</u>, 99 N.J. Eq. 186 (Ch. 1926)). Therefore, it has long been established that to avoid the operation of the SOF a party is required to present "clear and convincing" evidence.

Moreover, Brian's reliance on <u>Deutsch</u> to provide the lesser "preponderance of the evidence" standard is misplaced. In <u>Deutsch</u>, we held "the [SOF] will not prevent enforcement of an oral agreement relating to real

19

property if part performance provides a reliable indication that the parties have made an agreement of the general nature sought to be enforced." 213 N.J. Super. at 388.

In Deutsch, we did not directly address the burden of persuasion. Nonetheless, we cited to Restatement (Second) of Contracts § 129 cmt. b (Am. Law Inst. 1981) which provided "[t]he evidentiary element can be satisfied by painstaking examination of the evidence and realistic appraisal of the probabilities on the part of the trier of fact; this is commonly summarized in a standard that calls upon the trier of the facts to be satisfied by 'clear and convincing evidence.'"

Moreover, we cited to Cauco v. Galante, where the Court recognized, "the long established principle that in order to sustain part performance of a parol contract conveying an interest in real estate sufficiently to take the contract out of the [SOF,] the parol agreement must be clearly proved as to its terms and subject matter." 6 N.J. 128, 138 (1951) (emphasis added); see also Grabow v. Gelber, 138 N.J. Eq. 586, 591 (Ch. Ct. 1946) (emphasis added) ("[T]o take the agreement out of the operation of the [SOF,]" there must be "convincing proof."). Consequently, under the performance exception to the SOF, Brian's burden was by "clear and convincing" proof.

A-0451-22

Therefore, as a matter of law, Brian's burden of persuasion was by "clear and convincing" evidence.

Next, we consider Brian's argument that the judge erred in not finding an oral contract between him and Doris, and failing to find Doris's breach of the contract by not providing him with the proceeds of the sale of the Paterson Property. We agree with the judge that Brian failed to sustain his burden by "clear and convincing" evidence to warrant this relief.

The judge discounted the witnesses' testimony as it was "slanted or tilted or bias[ed]" and was infused with everyone's "self-interest." We perceive no reason to "disturb [the judge's] credibility findings." Mountain Hill, 403 N.J. Super. at 193.

Further, as the judge noted, while the 2018 Will provided for the devise of the Paterson Property to Brian, it failed to indicate anything regarding the purported oral agreement between Brian and Doris. In addition, Brian's one-sided writing of his conversation referenced the Fair Lawn and Paterson properties and how those properties would be devised between Brian and Sheryl. However, the writing was silent regarding an oral agreement between Brian and Doris.

21

Moreover, while Brian mentioned an undefined "agreement" in the text message to Sheryl, Doris denied any "promises" were made but acknowledged he wanted the Paterson Property. Brian did not reassert the existence of a purported agreement between him and Doris, but, instead, stated "very well" and severed his relationship with Doris.

Therefore, Brian's evidence fell short of "clearly and convincingly" establishing the existence of an oral contract between him and Doris to devise him the Paterson Property or the proceeds of the sale of the Paterson Property in exchange for his work at the Irvington Property. Thus, we conclude the judge properly found there was no "clear and convincing" evidence of an oral contract between Brian and Doris, and therefore, conclude there could be no breach.

Lastly, Brian argues the judge erred by ignoring his claim of unjust enrichment. We disagree. The judge's factual findings regarding this claim are fully addressed and supported in the record.

In accord with the Dead Man's Act, it was Brian's burden to establish his unjust enrichment claim by "clear and convincing" evidence. He was required to establish Doris "received a benefit and that retention of that benefit without payment would be unjust." Iliadis, 191 N.J. at 110.

However, Brian acknowledged there was no written evidence of his employment with Karroni. In the absence of any written evidence of employment, or any other evidence of employment; and with the judge's credibility findings regarding the witnesses' testimony on this claim, Brian failed to meet his "clear and convincing" burden to warrant relief on his unjust enrichment claim.

Any remaining arguments raised by Brian are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0451-22