**MDC INVESTMENT PROPERTY, L.L.C., et al., Plaintiffs,**

v.

**Anthony F. MARANDO, and Premium Financial Services, Defendants.**

**No. Civ.A. 97–3932 (KSH).**

United States District Court, D. New Jersey.

April 7, 1999.

---

694

Kenneth L. McElwee, Slattery, McElwee & Jespersen, P.C., Short Hills, NJ, for plaintiffs.

Dennis Houdek, Itkowitz Gottlieb & Harwood, New York City, for defendants.

## ORDER

HAYDEN, District Judge.

This Court having referred plaintiffs' motion for summary judgment on the defendant's counterclaims to the Honorable Ronald J. Hedges, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b)(1)(B); and the Court having considered plaintiffs' objections to the February 11, 1999 Report and Recommendation of Magistrate Judge Hedges; and the Court having reviewed *de novo* the Report and Recommendation; and good cause appearing;

It is this 6th day of April, 1999

**ORDERED** that the motion of plaintiffs for summary judgment on defendants' counterclaims is granted; and it is further

**ORDERED** that the Report and Recommendation of the United States Magistrate Judge is adopted and incorporated as the Opinion of this Court.

## REPORT AND RECOMMENDATION

HEDGES, United States Magistrate Judge.

## INTRODUCTION

This matter comes before me on plaintiffs' motion for partial summary judgment

dismissing defendants' counterclaims. The motion was referred to me by Judge Hayden. I have considered the papers submitted in support of and in opposition to the motion. There was no oral argument. Rule 78.

### STATEMENT OF FACTS

Jeffrey Taylor is a manager of MDC Investment Property, L.L.C. ("MDC"), one of the plaintiffs. MDC is a New Jersey limited liability company which is engaged in the business of real estate development, acquisition and investment. In 1995, MDC was interested in purchasing a large retail shopping mall in Baltimore, Maryland, known as the Security Square Mall ("Project"). In order to purchase this property, MDC had to locate a lender to finance the acquisition. Although the purchase price varied over the course of negotiations, the acquisition cost was approximately $48 million. Throughout the life of the Project Taylor, who has been involved in real estate development and acquisition for the past 20 years, engaged in active discussions with more than 15 mortgage brokers.

Taylor required all brokers to obtain his authorization before contacting potential lenders. His reasons were twofold. First, he did not want two brokers submitting conflicting claims for a commission. Such conflicting claims could jeopardize the transaction. Second, he did not want one broker to disrupt the negotiations undertaken by another broker. MDC was seeking to borrow approximately $48 million dollars, a large deal. The terms of financing would be complex and depend upon negotiated terms rather than standard contract language. If a second broker were to present proposed terms for the borrowing when another broker was in the midst of complex negotiations with the same financial institution, the negotiations could be severely disrupted. In addition, inconsistent terms proposed by different brokers could put a borrower (such as MDC) at a severe disadvantage during negotiations.

Defendant/plaintiff-in-counterclaim Anthony F. Marando is President of defendant/plaintiff-in-counterclaim PREMIUM FINANCIAL AND REALTY SERVICES, INC. (improperly named as "PREMIUM FINANCIAL SERVICES") ("PFS" and/or collectively referred to herein as "Defendants"). Marando first spoke with Harry Eng, a business associate of plaintiffs, in June of 1996. On June 25, 1996 Eng executed a confidentiality agreement with Marando and sent him an "offering package" regarding the Project on behalf of MDC. On June 27, 1996, Marando sent the "offering package" to Ray Anthony, a managing director of Nomura Asset Capital Corporation ("Nomura"). According to Marando, Anthony did nothing with the "offering package." It "just sat there and sat and sat and sat and sat."

On or about July 11, 1996, Marando was contacted by Taylor, who identified himself as a principal of MDC. During the conversation, Marando informed Taylor that he would endeavor to locate financing for the Project. Taylor asserts, and Marando denies, that during this conversation Marando agreed that he would not contact any source of financing without first obtaining his authorization and that Marando was informed of the other brokers working on the deal.[1] On July 12, 1996, Taylor forwarded Marando a revised "offering package." The revised "offering package" was a detailed description of the Project and included information that would assist potential lenders in assessing whether they have any interest in providing financing.

According to Taylor, one week after the July 12, 1996 conversation, Marando indicated that he had been "working" with two prospective lenders. Taylor reiterated that Marando was not to approach any prospective lenders without first obtaining

---

1. Taylor's testimony and Marando's testimony are inconsistent as to some of the issues surrounding the three-week period following the July 11, 1996 conversation. For clarity, I will set out their recitation of the facts. However, these inconsistencies are irrelevant.

approval. Marando agreed to reveal the names of the lenders who he had approached if MDC executed a "confidentiality agreement and non-circumvention" agreement. Marando explained that he required the non-circumvention agreement so that Taylor would not directly contact any lenders that Marando was working with and hence "circumvent" his claim as broker with regard to that particular lender. On July 16, 1996, the paries executed the same confidentiality agreement previously signed by Eng. However, a non-circumvention clause was inserted by Marando.

Taylor did not understand the confidentiality agreement to be any type of broker's commission agreement. Neither party discussed commissions regarding the Project. The only conversation, according to both parties, was that Marando's sources would be kept confidential and that Taylor would not "circumvent" Marando. It was Taylor's understanding that if MDC obtained financing from one of the sources that Marando was authorized to pursue then, during the negotiations of the commitment from the lender, he would reach an agreement with Marando regarding fees. In Taylor's experience, there is no such thing as a standard mortgage broker's commission. The broker's commission is a negotiated item that varies from transaction to transaction. Because the terms of financing can vary greatly, the mortgage broker's commission must "fit" into the transaction. If the terms of borrowing, including the commission, do not make economic sense MDC would not undertake the financing.

Shortly after Taylor returned the Confidentiality Agreement to Marando, Marando informed Taylor that the two sources of financing were Goldman Sachs and GE Capital. Taylor authorized Marando to pursue both as possible sources.

On July 19, 1996, Taylor met with George H. Jacobs, another mortgage broker. Jacobs told Taylor that Nomura might be interested. Taylor explained that past dealings with Nomura had been unsuccessful. However, Jacobs explained that he enjoyed a close relationship with Kathleen F. Corton, an officer at Nomura. Taylor authorized Jacobs to approach Nomura as a possible source of financing. On July 19, 1996, the very same day, Jacobs forwarded a letter to Corton with regard to the Project.

Sometime shortly before August 1, 1996, Marando informed Taylor that he had contacted Nomura with respect to the project. Taylor repeated that Marando was not to contact any possible lenders without first receiving authorization. Taylor further stated that Marando was not authorized to deal with Nomura on behalf of MDC. Taylor then informed Marando that Jacobs had been authorized and had already began negotiating with Nomura.

On July 31, 1996, Jacobs informed Taylor that Charles Rosenzwieg, an employee at Nomura who worked with Corton, had communicated a "quote." The quote consisted of the general terms by which Nomura was willing to finance the Project.

During the first week of August 1996, Taylor attended a meeting at Nomura's offices in New York. At the meeting, which was arranged by Jacobs, were Rosenzwieg, Corton, and Jeffrey Williams, all of whom represented Nomura. Brian Pilcher, an officer at Nomura, also attended. The parties discussed in detail the nature of the Project and began preliminary negotiations with regard to financing the Project. Jacobs was also present and participated extensively in these discussions. None of the parties that Marando claims to have contacted on behalf of MDC, Ray Anthony, Chris Tierney, and Danielle Caston, participated in any of the discussions between MDC and Nomura.

On August 22, 1996, Taylor received a commitment letter from Rosenzwieg for Nomura's financing of the Project. A copy of the letter was sent to Leib, another manager of MDC, and to Jacobs. Marando was not mentioned in the cover letter,

nor did he participate in any of the discussions with Williams, Corton, and Rosenzwieg that preceded the issuance of the Commitment Letter.

Marando's recitation of the three-week period following the July 11, 1996 conversation varies slightly. First, according to Marando, one week after the July 11 conversation, PFS forwarded the revised package to various lenders. Second, on July 18 Marando informed Taylor that he had submitted the Project to Heller, Nations, Goldman, GE, and Nomura. Third, Marando denies being told that he had to obtain prior approval before approaching any lender. In addition, Marando alleges that on July 31, he caused a 21 minute conference call to take place between himself, Taylor, and Chris Tierney ("Tierney") of Nomura, during which Tierney expressed an interest in doing business with MDC. Tierney, however, did not participate in either the origination or closing of the loan nor does he recall the conference call. In addition, Tierney testifies that by the time Marando brought the Project to his attention other in-house-brokers had already begun working on the loan. As such, it was not his to work on.

Both parties agree that on August 8, 1996, Taylor informed Marando that Jacobs was the exclusive broker with respect to Nomura. At that time, Taylor insisted that Marando cease all conversations with Nomura. On August 9, Taylor sent a letter to Marando requesting that he ceases all communication with Nomura. On August 22, Rosenzwieg, on behalf of Nomura, sent a commitment letter to MDC, to the attention of Taylor, relating to the financing of the Project. By letter dated August 27, Marando billed Nomura in the amount of $1,045,000 for his alleged services.

After Nomura issued its Commitment Letter, negotiations continued between MDC and Nomura. At that time, MDC agreed to pay Jacobs a 1% commission as a mortgage broker. If MDC had borrowed the full amount offered Jacobs would have been entitled to $430,000. Ultimately, MDC assigned its rights as the purchaser to Nomura. As a result, MDC never borrowed any funds from Nomura for the acquisition of the purchase.

On August 8, 1997, plaintiffs filed this action, alleging tortious interference with the contractual relationship between Nomura and MDC. MDC also requested a declaratory judgment that Marando was not entitled to any commission. Defendants counterclaimed, seeking recovery of a broker's commission with respect to Marando's (and PFS's) procuring financing from Nomura for MDC's acquisition of the Project. Plaintiffs then brought this partial summary judgment motion to dismiss the counterclaim. Plaintiffs contend: (1) Marando does not have a valid contract with MDC because the parties never reached an agreement as to Marando's compensation, an essential term of the contract; (2) in the absence of an enforceable contract, Marando cannot recover on a *quantum meruit* theory because he was not the "efficient procuring cause" of the transaction[2].

Defendants contend that a material issue of fact exists since the parties agreed that the broker's fee would be the "customary and usual" fee. Defendants also contend that a material issue of fact exists whether Marando was the "efficient procuring cause" of the transaction because Marando was the first broker to submit the transaction to Nomura, and the first broker to arrange direct contact between MDC and Nomura.

## DISCUSSION

Summary judgement shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

---

**2.** Plaintiffs also contend that Marando's alter ego claims against L. Robert Lieb and MDC–V are lacking in any evidentiary support and must be dismissed. However, I need not address this issue since I have recommended dismissing the counterclaims.

there is no genuine issue as to any material fact and that the moving party is entitled to a judgement as a matter of law." Rule 56(c); *see Hersh v. Allen Products Co.*, 789 F.2d 230, 232 (3d Cir.1986). In making this determination, a court must draw all reasonable inferences in favor of the non-movant. *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. dismissed*, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984). Whether a fact is "material" is determined by the substantive law defining the claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *United States v. 225 Cartons*, 871 F.2d 409, 419 (3d Cir.1989).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. Summary judgement must be granted if no reasonable trier of fact could find for the non-moving party. 477 U.S. at 249, 106 S.Ct. 2505.

While the non-moving party will bear the burden of proof at trial, the moving party's burden can be discharged by 'showing'—that is, pointing out to the District Court—that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party has carried its burden of establishing an absence of a genuine issue of material fact, the burden shifts to the non-moving party to "do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). When the non-moving party's evidence in opposition to a properly-supported motion for summary judgement is merely "colorable" or "not significantly probative," the court may grant summary judgment. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505. Further, when a non-moving party who bears the burden of proof at trial has failed, in opposition to a motion for summary judgment, to raise a disputed fact issue as to any essential element of his or her claim, summary judgment should be granted because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548.

Here, Marando insists that he was the "exclusive broker" for MDC with respect to obtaining financing for the Project. Further, he contends that, as an exclusive broker, he is entitled to a commission on any financing MDC obtained, even though he may have contributed nothing to procure such financing. In support of his contention, he relies on the "Confidentiality Agreement." [3]

■■■ However, even if I disregard all of MDC's contentions and accept only the undisputed facts, Marando's claims are still without merit since the alleged agreement is unenforceable. If the parties do not agree to one or more of the essential terms of a purported agreement, they have failed to create an enforceable agreement. *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 435, 608 A.2d 280 (1992) [4]; *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109, 417 N.E.2d 541, 543, 436 N.Y.S.2d 247, 249 (1981). The amount of compensation, the "price

**3.** MDC denies ever recognizing Marando as an exclusive broker and has unequivocally stated that Marando was repeatedly informed that MDC had engaged other broker to locate financing. In addition, MDC contends that it never understood the "Confidentiality Agreement" to be any sort of broker's agreement and that Taylor repeatedly instructed Marando not to approach any source of financing without prior authorization.

**4.** Defendants cite paragraph 5 of the Confidentiality Agreement in an effort to apply New York law. I need not address choice of law since there is no conflict ebtween New Jersey and New York law.

term," is an essential term of any contract. *Weichert,* 128 N.J. at 441, 608 A.2d 280; *Joseph Martin,* 52 N.Y.2d at 109–10, 417 N.E.2d at 543, 436 N.Y.S.2d at 249. In the absence of an agreement as to the manner or method of determining compensation the purported agreement invalid. *Weichert,* 128 N.J. at 441, 608 A.2d 280; *Joseph Martin,* 52 N.Y.2d at 110–11, 417 N.E.2d at 544, 436 N.Y.S.2d at 250.

Here, the undisputed evidence establishes that the parties never discussed or agreed on Marando's compensation. The Confidentiality Agreement is utterly devoid of any mention of Marando's compensation. Moreover, during his deposition, Marando repeatedly and emphatically testified that the parties never reached an agreement on compensation. Now, in his certification in opposition to the pending motion, Marando asserts that the parties agreed to a "customary and usual" commission. This assertion flatly contradicts his prior sworn deposition testimony. I reject Marando's conscious alteration of that testimony. *See Martin v. Merrell Dow Pharmaceuticals,* Inc. 851 F.2d 703, 705–06 (3d Cir.1988).

Defendants also argue that the parties reached an agreement regarding Defendants' exclusive agency as memorialized in the Confidentiality Agreement executed on July 16, 1996. The Confidentiality Agreement provides, in part, that PFS, "is acting solely as an exclusive source and agent for the placement of financing on the property known as Security Square Mall located in Baltimore, Maryland ..." However, Marando's claim that the "Confidentiality Agreement" is a contract to provide exclusive broker's service is suspect. The operative terms of the agreement deal not with the rights and obligations of a broker. Instead, the document is concerned with maintaining the confidentiality of information exchanged between the parties. Moreover, the document unambiguously refutes the suggestion that it creates an exclusive broker relationship. Paragraph 4 provides:

4. RELATIONSHIP OF THE PARTIES. **Neither party has an obligation under this Agreement to purchase any service** or item from the other party, or commercially offer any products using or incorporating the Confidential Information. **This Agreement does not create any agency**, partnership or joint venture. [emphasis added].

The evidence demonstrates that the parties never reached an agreement as to Marando's compensation or exclusive agency. This lack of agreement on critical terms shows that the parties never had the requisite "meeting of the minds" to create an enforceable contract. *Weichert,* 128 N.J. at 435, 608 A.2d 280; *Joseph Martin,* 52 N.Y.2d at 109–10, 417 N.E.2d at 543, 436 N.Y.S.2d at 249. The parties did not enter into an enforceable broker's contract.

 In the absence of an enforceable contract, Marando's compensation is limited to a claim for *quantum meruit. Weichert,* 128 N.J. at 437–38, 608 A.2d 280; *Joseph Sternberg, Inc. v. Walber 36th St. Assoc.,* 187 A.D.2d 225, 228, 594 N.Y.S.2d 144, 146 (1993). That is, Marando is entitled to receive "as much as he deserves." *Weichert,* 128 N.J. at 437–38, 608 A.2d 280. A broker may recover on the basis of *quantum meruit* only if he is the "efficient procuring cause" of the transaction upon which he basis his claim. *Weichert,* 128 N.J. at 441, 608 A.2d 280; *Greene v. Hellman,* 51 N.Y.2d 197, 206, 412 N.E.2d 1301, 1307, 433 N.Y.S.2d 75, 81 (1980).

New York and New Jersey have a nearly identical definition of procuring cause. The New York Court of Appeals has held that, in order for a broker to be the procuring cause, "there must be a direct and proximate link, as distinguished from one that is indirect and remote, between the bare introduction and the consummation." *Greene,* 51 N.Y.2d at 206, 412 N.E.2d at 1307, 433 N.Y.S.2d at 81. Similarly, the New Jersey Supreme Court has stated:

We recently held that in order to earn a commission, a real estate broker must be the " 'efficient procuring cause of the contract between the seller and purchaser.' " ... That required more than merely introducing seller and buyer.... Rather, the broker must cause "the seller to negotiate with a customer, produced by the broker, who is ready, able and willing to perform, and where the transaction is later consummated without a substantial break in the ensuing negotiations." It is thus readily inferable that entitlement to a commission presupposes the performance of substantial brokerage services. *In re Roth,* 120 N.J. 665, 673, 577 A.2d 490 (1990) (citations omitted).

 Marando was not the procuring cause of either the negotiations or the transaction between Nomura and MDC. Marando contends that he was the "efficient procuring cause" since he was the first broker to submit the transaction to Nomura and the first broker to arrange a conference call between MDC and Nomura. However, according to Marando's own deposition testimony, his efforts to excite Nomura's interest in MDC's project were notably unsuccessful. Marando originally submitted the project to Ray Anthony, but Anthony never responded. As Marando testified, the submission "just sat there and sat and sat and sat and sat."

Marando next alleges that he is entitled to a commission because he was the first broker to arrange a conference call between MDC and Nomura. That call allegedly took place between Tierney and Taylor. However, according to Tierney, he was not involved in the origination or closing of the loan. In addition, he does not recall participating in a conference call with Taylor and Marando.[5] He also testified that by the time Marando forwarded him an offering package for the Project other in-house brokers had already begun working on the loan. As such, it was not

his to work on. By the time that Marando introduced Tierney to the Project, MDC had already made substantial progress in negotiations with other employees of Nomura who had been introduced to MDC by Jacobs. Indeed, two days after Marando brought the transaction to Tierney's attention, another Nomura employee, Rosenzwieg, had issued to Jacobs a "quote" for financing the project.

In sum, Marando had nothing to do with the introduction of the key players at Nomura to MDC or arranging the meeting between MDC and Nomura. Marando did not participate in any of the discussions with the Nomura representatives that preceded the commitment letter. Neither of Marando's contacts (Anthony or Tierney) were involved in the transaction. As such, Marando was not the procuring cause of the transaction between MDC and Nomura. Marando's *quantum meruit* claim should be dismissed.

### CONCLUSION

For the reasons set forth above, I recommend that the plaintiffs' motion for partial summary judgement be granted.

Pursuant to Local Civil Rule 72.1(c)(2), the parties have ten (10) days from service of this Report and Recommendation to file and serve objections.

---

**5.** Even assuming that the conference call took place. Marando's insignificant efforts to secure financing preclude a finding that he was the procuring cause.