T.C. Memo. 2011-163

UNITED STATES TAX COURT

ESTATE OF EMILIA W. OLIVO, DECEASED, ANTHONY M. OLIVO,
ADMINISTRATOR, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15428-07.                    Filed July 11, 2011.

<u>John R. Crayton</u>, for petitioner.

<u>Kristina L. Rico</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, <u>Judge</u>:  Respondent determined a deficiency in the
Federal estate tax of the Estate of Emilia W. Olivo (the estate)
of $348,852.05 and a penalty of $13,309.29 pursuant to section

6662(g).[1]  After concessions, the issues we must decide are:  (1) Whether the estate is entitled to deduct as an expense the claim on the estate tax return for services rendered by Anthony M. Olivo (Mr. Olivo), the son of Emilia W. Olivo (decedent) to decedent before her death; (2) whether the estate is entitled to deduct the administrator's commission paid to Mr. Olivo; and (3) whether the estate is entitled to deduct the accountant's and attorney's fees claimed by Mr. Olivo.

## FINDINGS OF FACT

Some of the facts and certain exhibits have been stipulated. The parties' stipulations of fact are incorporated in this opinion by reference and are found accordingly.

Decedent died intestate on April 26, 2003.  At the time of her death, decedent was a widow who resided in Haddonfield, New Jersey.  Decedent was survived by four children:  Mr. Olivo, Matthew P. Olivo (Dr. Olivo), Marcia O. Hamilton (Ms. Hamilton), and Emilia H. Glaes (Ms. Glaes).

Mr. Olivo, the administrator of the estate, resided with decedent at the time of her death and had provided care for her for many years before her death.  Mr. Olivo began providing nearly full-time care for decedent and her late husband, Matthew

---

[1]Unless otherwise indicated, section references are to the Internal Revenue Code of 1986 (Code), as amended and in effect as of the date of decedent's death, and Rule references are to the Tax Court Rules of Practice and Procedure.

W. Olivo, his parents (we sometimes refer to Matthew W. Olivo as his father), around September 18, 1994, when decedent fell and suffered a compression fracture of her lower spine that left her nearly paralyzed in both legs. At that time, Mr. Olivo's father was already having severe health problems, including insulin-dependent diabetes and congestive heart failure. His father had suffered a heart attack in the early 1990s and underwent several medical procedures on his heart, including an open-heart bypass surgery.

Around the time of decedent's fall during September 1994, Mr. Olivo began to find it increasingly difficult to maintain his practice as an attorney. He had received his J.D. from Rutgers University School of Law (Camden) in 1976 and his LL.M. in taxation from New York University School of Law in 1979. Mr. Olivo practiced law at private firms in Cherry Hill, New Jersey, from 1976 until 1988, when he began his own practice. However, his solo practice began to disintegrate during the mid-1990s, in part because of the amount of time he devoted to his parents' health problems. He earned no significant income from his law practice during the period when he was caring for his parents, from 1994 through 2003.

Mr. Olivo prepared a durable power of attorney for his father, which his father executed on February 15, 1995. Mr. Olivo's father died testate on September 21, 1995. His will

designated decedent and Dr. Olivo as coexecutors of his estate. The probating of Matthew W. Olivo's will was apparently quite contentious, and a New Jersey court ultimately had to intervene and appoint Ms. Hamilton as administrator of the estate. During that period, Mr. Olivo represented decedent, and he prepared a durable power of attorney for her, which she executed on February 27, 1996. Family relationships remained strained for several years after his father's death, and decedent and Dr. Olivo were estranged for a while, but family relationships were generally restored by the year 2000.

Decedent had numerous health problems during the last years of her life. The compression fractures to her spine left her incapable of caring for herself and basically paralyzed in both legs. Mr. Olivo had to use a sliding board to move decedent in and out of bed. He found it difficult to move her using the sliding board because she was very overweight at that time. As a result, he eventually purchased a Hoyer lift, which made it easier to move her from bed to her wheelchair and back. She also required assistance to use the bathroom, to get dressed, and to bathe. Decedent suffered from a number of urinary tract infections and, during 1995, she developed incontinence, which required Mr. Olivo to clean up after her and change her clothes. Decedent was diabetic and became insulin-dependent during 1999, which required Mr. Olivo to test the insulin levels in her blood

several times each day and, if needed, inject her with insulin. Mr. Olivo was also responsible for preparing all meals and doing general housekeeping. He employed home health aids to assist him, but the aids were not registered nurses and therefore could not administer decedent's medications or do the blood sticks and insulin injections she required. He was also frequently unable to get aids to help him on the weekends, and they were not available at all hours.

Mr. Olivo kept extensive records of decedent's medications, hospital visits, and diagnoses. He also kept a composition notebook where he recorded her blood sugar levels, blood pressure, pulse, and body temperature. He took those measurements two to three times each day. He also used the composition notebook to keep track of decedent's bodily functions and of when he applied dermatological cream to rashes and sores she developed from being bedridden. He recorded observations in the composition book about seven times each day.

Decedent's other health problems included hyperparathyroidism, hyperthyroidism, hypertension, osteoporosis, and chronic deep vein thrombosis. She also had periodic bouts with pneumonia, and she developed congestive heart failure and coronary artery disease during the last several years of her life. She was hospitalized approximately 25 times during the last decade of her life.

Caring for decedent took a toll on Mr. Olivo. At some point during 1998, Dr. Olivo became concerned about Mr. Olivo's health. Mr. Olivo had been losing weight, and his sleep was frequently interrupted by decedent's needs. In fact, he had been sleeping on the couch with his clothes on every night. During 1998, as a result of his concern about Mr. Olivo's health, Dr. Olivo had a conversation about decedent's care with decedent and Ms. Hamilton. Dr. Olivo believed that his brother, Mr. Olivo, was providing excellent care for decedent, and his only concern was that Mr. Olivo not injure his own health.

Dr. Olivo, Ms. Hamilton, and decedent subsequently had a conversation with Mr. Olivo about his care for decedent. Mr. Olivo was upset about criticism he had received from Ms. Glaes, and he offered to stop providing such care and to hire round-the-clock nurses instead. Dr. Olivo, Ms. Hamilton, and decedent asked Mr. Olivo to continue caring for decedent, which he agreed to do.

Mr. Olivo continued to care for decedent until her death on April 26, 2003. After her death, Mr. Olivo began to prepare an inventory of her estate, and he sought to be the estate's administrator by requesting that his siblings renounce their rights to that position. However, Ms. Glaes refused to do so until August 2004, at which point she apparently relented, and Mr. Olivo was appointed administrator of the estate. By that

point, Mr. Olivo had already filed the estate's tax return, which the IRS received on July 31, 2004. On that return, he claimed a deduction of $44,200, which he calculated was the statutory amount to which he would be entitled as a commission for his services as administrator of the estate. He also estimated attorney's fees of $50,000, which he calculated on an hourly rate of $150, and accountant's fees of $5,000. Finally, he also claimed a deduction of $1,240,000 as a debt the estate owed to him for the care he provided to decedent pursuant to an alleged agreement he had with her to compensate him for his services in caring for her (alleged agreement).

When he filed the estate's return, Mr. Olivo had not actually been paid an administrator's commission and the attorney's fees he claimed on the estate tax return on behalf of the estate. On September 23, 2006, Mr. Olivo wrote a $44,200 check from the estate to himself in payment of an administrator's commission. From December 31, 2004, to December 31, 2008, Mr. Olivo wrote himself a series of checks from the estate to pay for attorney's fees and litigation expenses. Those checks totaled $55,400. The estate has not actually paid Mr. Olivo any of the $1,240,000 claimed as a deduction on the return pursuant to the alleged agreement. The probate court has neither finalized the administration of the estate nor approved the payment of any expenses.

On or about April 6, 2007, respondent issued and mailed a notice of deficiency to Mr. Olivo, as administrator of the estate. On behalf of the estate, Mr. Olivo timely filed a petition with this Court.

## OPINION

### Burden of Proof

In general, the Commissioner's determinations are presumed correct, and the taxpayer bears the burden of proving otherwise. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). However, section 7491(a) places the burden of proof on the Commissioner with respect to any factual issue relevant to a taxpayer's liability for tax if: (1) The taxpayer introduces credible evidence with respect to such issue; and (2) the taxpayer satisfies certain other conditions, including substantiation of any item, proper maintenance of all required records, and cooperation with the Government's requests for witnesses, documents, and the like. Sec. 7491(a)(2); see also Rule 142(a)(2). Taxpayers bear the burden of proving that they have met the requirements of section 7491(a). Rolfs v. Commissioner, 135 T.C. 471, 483 (2010).

The estate contends that the burden of proof has shifted to respondent pursuant to section 7491(a). However, as we discuss below, the only evidence the estate produced to substantiate any of the claimed deductions was the testimony of Mr. Olivo. The

estate failed to provide a written contract or any other documentary or corroborating evidence to substantiate the alleged agreement, and it failed to provide any records or other written documentation or other corroborating evidence to show how much legal work Mr. Olivo provided for the estate.  Overall, the evidence, in the form of testimony, provided by the estate to substantiate its deductions is not credible within the meaning of section 7491(a).  Consequently, we conclude that the burden of proof has not shifted to respondent with respect to any factual issue pursuant to section 7491(a).

## The Claimed Deduction Based Upon the Alleged Agreement and Alternatively Quantum Meruit

Section 2053(a) provides that the value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts for claims against the estate and administration expenses as are allowable by the laws of the jurisdiction under which the estate is being administered. Administration expenses include executor's commissions; attorney's fees, including those fees associated with contesting an asserted deficiency; and miscellaneous expenses such as appraiser's fees, accountant's fees, and court costs.  Sec. 20.2053-3, Estate Tax Regs.

We first consider the estate's contention that it is entitled to deduct $1.24 million to pay Mr. Olivo for decedent's care pursuant to the alleged agreement.  Regarding the alleged

agreement between Mr. Olivo and decedent, Mr. Olivo testified that at some point during 1998, he learned that one of his sisters, Ms. Glaes, had made a comment that all he did was sit around and watch television while getting free room and board. He was upset by the remark, and he told decedent about it when she noticed that he was upset. Mr. Olivo testified that decedent subsequently offered to pay him $1,000 per week for the care-giving that he provided for her. Mr. Olivo further testified that he suggested that $200 per day would be agreeable to him. However, he additionally testified that during the next several days, he became worried about her finances, and he suggested to her that she not pay him anything then but that she defer the payment until her death. Mr. Olivo also testified that decedent agreed to his suggestion but that, to avoid a complicated interest calculation, she agreed to pay him $400 per day, all of which would be deferred until her death. However, Mr. Olivo never reduced the alleged agreement to writing. He acknowledged during his testimony at trial that he "could have and should have" memorialized their agreement, but he was too distracted by the day-to-day details of caring for decedent. He explained that he was not thinking like a lawyer during that time.

The only evidence the estate offered to prove the alleged agreement was the testimony of Mr. Olivo. Mr. Olivo never reduced the alleged agreement to writing, nor were there any

other witnesses to the alleged agreement or any other corroborating evidence.  We need not accept testimony that is improbable, self-serving, and uncorroborated by other evidence.  See, e.g., Baird v. Commissioner, 438 F.2d 490, 493 (3d Cir. 1970), vacating T.C. Memo. 1969-67; Shea v. Commissioner, 112 T.C. 183, 189 (1999); Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

Moreover, under New Jersey law, the oral promise of a decedent must be proved by clear and convincing evidence.  N.J. Stat. Ann. sec. 2A:81-2 (West 1994); Haynes v. First Nat'l. State Bank, 432 A.2d 890, 901 n.6 (N.J. 1981).  The clear and convincing evidence standard requires the trier of fact to have "'a firm belief or conviction as to the truth of the allegations sought to be established.'"  Abbott ex rel. Abbott v. Burke, 971 A.2d 989, 1046 (N.J. 2009) (quoting Liberty Mut. Ins. Co. v. Land, 892 A.2d 1240, 1244 (N.J. 2006)).  We need not decide whether to apply New Jersey's clear and convincing standard because we conclude, on the basis of our analysis below, that Mr. Olivo's testimony fails to satisfy even the less exacting preponderance standard normally applied by this Court.[2]

---

[2]Although the standard of proof normally applied in Tax Court cases is a preponderance of the evidence, when we are applying State law, we have often applied the standard of proof under State law.  See Ward v. Commissioner, 87 T.C. 78, 93 n.4 (1986) (and cases cited thereat).  However, as stated above, because we conclude that the estate's claim fails to satisfy even

(continued...)

Mr. Olivo's testimony recounting the facts surrounding the alleged agreement strikes us as highly questionable. Although we understand that Mr. Olivo had a lot on his mind during the years when he was caring for his parents, his claim that he was unable to think like a lawyer during that period is belied by the fact that he prepared powers of attorney for both of his parents and had them execute those powers of attorney during 1995 and 1996. Given Mr. Olivo's training and experience as an attorney, given how contentious the probating of his father's estate had been, given the apparent animosity between Mr. Olivo and Ms. Glaes, and given Mr. Olivo's vested interest in ensuring that he would receive compensation from decedent pursuant to the alleged agreement, we find it difficult to believe that he would not have reduced the alleged agreement to writing or at least have some corroborating evidence beyond his self-serving testimony.

In light of the foregoing, we decline to accept Mr. Olivo's uncorroborated testimony regarding the alleged agreement. Accordingly, we conclude that the estate has failed to establish that decedent entered into the alleged agreement with Mr. Olivo. Consequently, we hold that Mr. Olivo's claim for compensation

---

[2](...continued)
the preponderance standard, we need not decide whether to apply New Jersey's clear and convincing standard to the existence of the oral promise. See id.

pursuant to the alleged agreement may not be deducted by the estate.

In the alternative, the estate contends that Mr. Olivo is entitled to some recovery under quantum meruit. Even in the absence of a contract, when one party has conferred a benefit on another and the circumstances are such that it would be inequitable to deny recovery to the party conferring the benefit, New Jersey courts allow recovery in quasi-contract. Weichert Co. Realtors v. Ryan, 608 A.2d 280, 285 (N.J. 1992). Quantum meruit is a type of quasi-contractual recovery that allows a plaintiff to recover the reasonable value of services rendered when the plaintiff conferring the services had a reasonable expectation of payment. Id. To recover under a theory of quantum meruit, a plaintiff must establish: "'(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services.'" Starkey, Kelly, Blaney & White v. Estate of Nicolaysen, 796 A.2d 238, 242-243 (N.J. 2002) (quoting Longo v. Shore & Reich, Ltd., 25 F.3d 94, 98 (2d Cir. 1994)).

Mr. Olivo's care for decedent during the last years of her life was extraordinary, and the efforts he expended on her behalf are commendable. However, we conclude that the estate has not established that Mr. Olivo is entitled to recover for that care

under quasi-contract because it has not shown entitlement under New Jersey law.  There is a presumption under New Jersey law that services rendered to a family member living in the same household are rendered gratuitously.  The New Jersey Supreme Court has explained the presumption as follows:

> "Ordinarily, where services are rendered and voluntarily accepted, the law will imply a promise upon the part of the recipient to pay for them; but where the services are rendered by members of a family, living as one household, to each other, there will be no such implication from the mere rendition and acceptance of the services.  In order to recover for the services, the plaintiff must affirmatively show either that an express contract for remuneration existed or that the circumstances under which the services were rendered were such as exhibit a reasonable and proper expectation that there would be compensation.  The reason of this exception to the ordinary rule is that the household family relationship is presumed to abound in reciprocal acts of kindness and good will, which tend to the mutual comfort and convenience of the members of the family, and are gratuitously performed; and, where that relationship appears, the ordinary implication of a promise to pay for service does not arise because the presumption, which supports such implication, is nullified by the presumption that between members of a household services are gratuitously rendered.  The proof of the services, and as well of the family relation, leaves the case in equipoise, from which the plaintiff must remove it, or fail."

Waker v. Bergen, 132 A. 669, 669-670 (N.J. 1926)(quoting Disbrow v. Durand, 24 A. 545, 546 (N.J. 1892)).  Applying New Jersey law to the instant case,[3] we must presume that Mr. Olivo's services were gratuitous unless the estate can prove by a preponderance of the evidence that Mr. Olivo was entitled to recompense for his

---

[3]The standard of proof is by a preponderance of the evidence regardless of whether the New Jersey law presumption applies.

services.  Children do provide gratuitous care for their aging parents.  Indeed, it is uncontested that Mr. Olivo provided care to his parents from 1994 until 1998 with no expectation of compensation.  Other than the testimony of Mr. Olivo, the estate has offered no other evidence that Mr. Olivo's services beginning in 1998 were not gratuitous so as to overcome the New Jersey law presumption that the services were gratuitous.  As with Mr. Olivo's uncorroborated, self-serving testimony regarding the alleged agreement, we decline to accept Mr. Olivo's testimony to establish that the services he performed were not gratuitous.  Moreover, the estate has made no payments to Mr. Olivo to compensate him for decedent's care, the probate court has not authorized any such payments, and the record contains no evidence that Mr. Olivo has made any claim against the estate for his services.  Consequently, we hold that the estate is not entitled to deduct any recovery under quasi-contract for the services Mr. Olivo rendered to decedent during the last years of her life.

The Claimed Deduction for Administrator's Commission

We next consider whether the estate may deduct the administrator's commission paid to Mr. Olivo.  When Mr. Olivo filed the estate's tax return, he had not yet been paid an administrator's commission.  For decedents who died before October 20, 2009, the regulations provide that a deduction for an administrator's commission will be allowed on the final audit of

the return, even if the commission has not actually yet been paid or fixed by a decree of the proper court, so long as three conditions are met:

> (i) The district director is reasonably satisfied that the commissions claimed will be paid;

> (ii) The amount claimed as a deduction is within the amount allowable by the laws of the jurisdiction in which the estate is being administered; and

> (iii) It is in accordance with the usually accepted practice in the jurisdiction to allow such an amount in estates of similar size and character.

Sec. 20.2053-3(b)(1), Estate Tax Regs.

Respondent contends, citing In re Linn's Estate, 199 A. 396 (N.J. 1938), In re Smith's Estate, 153 A. 647 (N.J. 1931), and In re Jula's Estate, 130 A. 733 (N.J. 1925), that the amounts paid to Mr. Olivo are not deductible because New Jersey law requires that those amounts be approved by a probate court.  We do not agree.  An amendment to N.J. Stat. Ann. sec. 3B:18-14 (West 1983 & Supp. 2011) enacted during 2000 clarifies that, under New Jersey law, the commissions fixed by statute do not require judicial approval.[4]  Rather, that statute provides that commissions fixed by statute may be reduced by the court

---

[4]The statements accompanying the bill amending the statute specifically noted that the amendment was intended to repudiate a position taken by the Internal Revenue Service at that time, and taken by respondent in this case, that administrator's commissions were not allowed under New Jersey law until approved by a probate court.  Assemb. B. 2049, 209th Leg. (N.J. 2000); S.B. 952, 209th Leg. (N.J. 2000).

only upon application by a beneficiary adversely affected upon an affirmative showing that the services rendered were materially deficient or that the actual pains, trouble and risk of the fiduciary in settling the estate were substantially less than generally required for estates of comparable size.

Id. Unless a beneficiary objects to the commissions and proves that they are excessive, the statutory formula determines the amount of commission that will be allowed. Consequently, under current New Jersey law, in the absence of a judgment from the probate court directing otherwise, the allowable administrator's commissions are determined as follows: 5 percent on the first $200,000 of the estate; 3.5 percent on the excess over $200,000 up to $1 million; and 2 percent on the excess over $1 million. Id.

Applying the statutory formula to the estate value of $1,711,163.81 reported on the return yields an administrator's commission of $52,223.28. Mr. Olivo testified that he used the statutory formula to calculate the deduction he claimed on behalf of the estate on its return. However, the estate claimed a deduction of only $44,200. In its brief, the estate contends that Mr. Olivo made a calculation error. It is unclear whether the estate will pay Mr. Olivo the difference between the amount calculated by applying the statutory formula and the amount actually paid. Pursuant to the regulations, for the difference to be deductible by the estate, the amount must actually be paid

or the district director must be "reasonably satisfied" that such amount will be paid.  See sec. 20.2053-3(b)(1), Estate Tax Regs.

In the instant case, we hold that the parties shall use the foregoing formula to calculate the administrator's commission that the estate is entitled to deduct under New Jersey law. However, if the estate does not actually pay Mr. Olivo the difference between what he has already been paid and the amount permitted under the statutory formula, the estate shall be allowed to deduct only the amount actually paid unless the parties agree otherwise in the Rule 155 computations, which we order below.

The Claimed Deduction for Attorney's Fees

Finally, we consider whether the estate is entitled to deduct $55,400 in accountant's and attorney's fees actually paid to Mr. Olivo.  The regulations in effect at the time of decedent's death provided that attorney's fees of an estate are allowable on the final audit of its return even if not yet paid, nor awarded by the proper court, as long as

> the district director is reasonably satisfied that the amount claimed will be paid and that it does not exceed a reasonable remuneration for the services rendered, taking into account the size and character of the estate and the local law and practice.

Sec. 20.2053-3(c)(1), Estate Tax Regs.  Additionally, a deduction "for reasonable attorneys' fees actually paid in contesting an asserted deficiency * * * will be allowed even though the

deduction, as such, was not claimed in the estate tax return". Sec. 20.2053-3(c)(2), Estate Tax Regs.

Respondent does not contest that the attorney's fees incurred by the estate in contesting the determined deficiency before this Court are deductible, and we see no reason why they should not be deductible. Accordingly, we conclude that those attorney's fees are deductible by the estate.[5]

Respondent contends that the estate is not entitled to the $55,000 deduction claimed on its return for attorney's and accountant's fees because it has not substantiated those fees. On the estate's return, Mr. Olivo estimated and deducted $50,000 for attorney's fees and $5,000 for accountant's fees. However, according to Mr. Olivo's testimony, the actual payments the estate made for expenses totaling $55,400 were all for legal fees or reimbursements. It does not appear from the record that any accounting fees were incurred. Accordingly, we will treat all those fees together as legal fees.

New Jersey law provides that, where the administrator of an estate is also an attorney and performs legal work in addition to his services as administrator, he will be entitled to a reasonable legal fee in addition to the administrator's commission. N.J. Stat. sec. 3B:18-6 (West 1983 & Supp.

---

[5]The amount of those attorney's fees shall be included in the Rule 155 computations that we order below.

2011). The burden is on the attorney to substantiate the legal fees claimed, and New Jersey courts will consider a number of factors in determining whether those amounts are reasonable, including: The size and complexity of the estate; the time required to complete necessary legal work; the degree of legal skill required to complete that work; whether the estate was involved in any litigation and the outcome of that litigation; and any other factors the court considers important. In re Estate of Simon, 226 A.2d 639, 641 (N.J. Super. Ct. App. Div., 1967); In re Estate of Bloomer, 129 A.2d 35, 37 (N.J. Super. Ct. App. Div., 1957); In re Turnbull, 1 N.J. Misc. 41, 41-42 (1923). In determining the appropriate value for legal fees where the attorney was also the executor or administrator of the estate, the court must distinguish between those duties that actually required legal expertise and those that were performed as executor or administrator. In re Estate of Simon, supra at 642. We apply the standards set forth in New Jersey law in deciding the deductibility of the attorney's fees by the estate in the instant case.

The record shows that Mr. Olivo did perform some legal services for the estate, in addition to his services as administrator. For instance, he filed the estate's tax return, handled the IRS examination on behalf of the estate, and filed the estate's original petition with this Court. However, the

record does not establish the value of his legal services. Mr. Olivo testified that the $55,400 in attorney's fees claimed by the estate and paid to him included: $300 for an appraisal of decedent's home; $200 for the surrogate's fee to initiate the administration of the estate; $40 in filing fees for releasing the funding bonds; and $60 for filing the petition in this Court. Mr. Olivo testified that the remaining $54,800 consisted of payments for legal services he rendered to the estate. However, Mr. Olivo kept no records of the time he spent performing legal services for the estate. Instead, he merely estimated the number of hours and used a billing rate of $150 per hour. On account of the lack of corroborating evidence in the record concerning the attorney's fees issue, we decline to accept Mr. Olivo's estimates of the amount of time he spent performing legal services for the estate.

Where a taxpayer has established that a deductible expense has been paid but not substantiated the amount, we may estimate the amount, bearing heavily against the taxpayer "whose inexactitude is of his own making." Cohan v. Commissioner, 39 F.2d 540, 544 (2d Cir. 1930). However, if the evidence provides us no basis on which to make an estimate, we will not allow any deduction. Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985). The record provides a paucity of evidence from which we could make any estimate as to the amount of specifically legal work

performed by Mr. Olivo.  Accordingly, we are unable to estimate the amount of attorney's fees that the estate may be entitled to deduct in payment for Mr. Olivo's services.  However, we conclude that the estate is entitled to deduct $600 for the administrative fees for appraisals and various filings.  Additionally, as stated above, it is entitled to deduct the amount of attorney's fees it incurs in contesting the deficiency in the instant case.

In reaching the foregoing holdings, we have considered all of the parties' arguments, and to the extent not addressed herein, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.